Lola REVITHES, Petitioner,

v.

DISTRICT OF COLUMBIA RENTAL
HOUSING COMMISSION,
Respondent,

Bessie Janis Stamper and Igor
Kozak, Intervenors.

No. 84–1269.

District of Columbia Court of Appeals.

Argued Sept. 26, 1985.
Decided Dec. 1, 1987.*

* This opinion was released in typed form prior to printing.

Kenneth J. Loewinger, with whom Paul D. Crumrine, Washington, D.C., was on brief, for petitioner.

Richard B. Nettler, Asst. Corp. Counsel at the time the case was argued, and Inez Smith Reid, Corp. Counsel at the time the brief was filed, John H. Suda, Principal Deputy Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for respondent.

Richard D. Carter, for intervenors.

Before PRYOR, Chief Judge, and MACK and BELSON, Associate Judges.

MACK, Associate Judge:

Petitioner Lola Revithes seeks review of a decision of the Rental Housing Commission ("RHC") affirming a hearing examiner's order that Revithes refund to tenant-intervenors Bessie Janis Stamper and Igor Kozak $10,784 each as trebled damages for

rent overcharges for the period between August 1978, and October 1982. The decision and order also imposed a $5,000 fine on Revithes for her allegedly willful violations of the rental housing laws. On appeal, Revithes raises two issues. She argues that under the "small landlord" exemption to rent control, she was exempt from rent control limitations during the period in which she allegedly illegally increased the rents. She also argues that the RHC is not statutorily authorized to impose fines for willful violations of the Rental Housing Act, and that, alternatively, the imposition of the fine violated due process and was unsupported by substantial evidence.

We affirm the findings of non-exemption and the damages imposed thereon for the period up to and including June 25, 1980. We also affirm so much of the order as imposes a $5,000 fine. We reverse and remand for a more careful evaluation of Revithes' claim of exemption for the period subsequent to June 25, 1980. If Revithes' claim of exemption subsequent to June 25, 1980, fails, we nevertheless direct the agency to vacate the award of treble damages for the period after January 1, 1982, since Revithes' reliance on the agency's initial erroneous establishment of a rent ceiling of $189 as of January 1, 1982, constitutes

"good cause" for imposing a single award only. 14 DCMR § 3410.2 (1986).

## I.

### A.

A brief summary of the Rent Stabilization Program provides the necessary background for this somewhat procedurally complex case.

Since 1975, the Council of the District of Columbia has enacted four consecutive acts designed to stabilize rents, moderate evictions, and regulate the conversion of rental units to condominiums or cooperatives within the District of Columbia. These rental housing acts are commonly referred to as the 1975 Act,[1] the 1977 Act,[2] the 1980 Act,[3] and the 1985 Act.[4] At the heart of the Rent Stabilization Program of all four Acts is the registration requirement. In order to monitor rent increases according to the statutory scheme, landlords are required to register their rental units with the Rental Accommodations and Conversion Division ("RACD") of the Department of Consumer and Regulatory Affairs.[5] Information furnished on the registration form results in a determination of a "base rent" for each registered unit. The base rent level may be increased to a "rent ceiling" by taking increases in accordance

1. The Rental Accommodations Act of 1975, effective November 1, 1975, was passed pursuant to a congressional mandate authorizing the District government to take appropriate steps to meet the crisis in overcrowding and increasing rents plaguing the District. D.C.Law 1–33, 22 D.C.Reg. 2490 (1975) (codified at D.C.Code §§ 45–1631 to –1674 (1976 Supp.)); Pub.L. No. 93–157, § 3, 87 Stat. 624 (1973) (codified at D.C.Code § 45–1622 (1974 Supp.)) (congressional authorization of this legislation).

2. The Rental Housing Act of 1977 took effect March 16, 1978, and repealed and replaced the 1975 Act. D.C.Law 2–54, 24 D.C.Reg. 5334 (1977) (codified at D.C.Code §§ 45–1681 to –1699.27 (1979 Supp.)).

3. Effective May 1, 1981, the Rental Housing Act of 1980 repealed and replaced the 1977 Act. D.C.Law 3–131, 28 D.C.Reg. 326 (1981) (codified at D.C.Code §§ 45–1501 to –1597 (1981)). Congressional review of the 1980 Act was completed on March 4, 1981, but the law did not take effect until May 1, 1981. The effective date of the

1980 Act was clarified subsequent to its passage. D.C.Law 4–6, § 906(b), 1981–1982 D.C.Stat. 16. The clarification was partially made necessary due to the previous extension of the termination date of the 1977 Act until April 30, 1981. D.C.Law 3–106, 1979–1980 D.C.Stat. 470.

4. The 1985 Act, D.C.Law 6–10, 32 D.C.Reg. 3089 (1985) (codified at D.C.Code §§ 45–2501 to –2594 (1986 Supp.)), became effective July 17, 1985. 32 D.C.Reg. 4438 (1985).

5. Prior to the creation of the Department of Consumer and Regulatory Affairs, the Rental Accommodations Office ("RAO") was the first level administrative agency responsible for enforcement of the rental housing laws. The RAO was abolished pursuant to Reorganization Plan No. 1 of 1983, 30 D.C.Reg. 374, 378 (1983), which became effective March 31, 1983. 30 D.C.Reg. 1651 (1983). The registration requirement of the 1975 Act first took effect November 1, 1975. Registration was to be completed within ninety days. D.C.Law 1–33, § 202(b), 22 D.C.Reg. 2490, 2502 (1975).

with the law. Unless a rental unit is properly exempt from the Rent Stabilization Program, one of the pre-conditions for increasing rent above the base level is proper registration with the RACD.[6]

The so-called "small landlord" exemption at issue here has been a continuously evolving feature of the Rent Stabilization Program since its inception. The "small landlord" provision of the 1975 Act originally exempted only those rental units rented by the occupant of a housing accommodation of not more than two rental units.[7] *Frenkel v. District of Columbia Rental Accommodations Commission*, 432 A.2d 1226, 1229 (D.C.1981). In order to facilitate administration of the program, emergency legislation of August 12, 1976, (the "August Act") eliminated the "occupancy" requirement and exempted from coverage those rental units in a housing accommodation of not more than *4* units, all interest in which was owned by not more than 4 natural persons none of whom had any direct or indirect financial interest in any other rental unit or housing accommodation.[8] *Id.* "[Four] or fewer units" has consistently remained the "cut-off" point for exemption regardless of whether or not those units are located within the same housing accom-

modation.[9] The 1985 Act amended and clarified the language to exempt "4 or fewer *rental* units." [10]

Under the 1975 Act as originally enacted, even "small" landlords were required to register their rental units.[11] That requirement was subsequently eliminated in August 1976.[12] Since November 1976, however, small landlords have been required to file a Claim of Exemption Statement affirming their eligibility for exemption.[13] The Rental Housing Acts of 1977, 1980 and 1985 have likewise required that landlords seeking the exemption file valid claims of exemption with the Rent Administrator.[14]

**B.**

In 1978, and at all times relevant to this controversy, tenant-intervenors resided in separate units at 233 Pennsylvania Avenue, S.E., a multi-unit structure owned by Revithes. It is undisputed that the building at 233 Pennsylvania Avenue, S.E., contained three residential rental units used and occupied by tenants. The tenants' claims of Revithes' non-exempt status and her consequent unlawful rent increases arose out of her ownership of an adjacent property at 235 Pennsylvania Avenue, S.E.,

---

6. The 1977 Act, D.C.Law 2–54, § 208(a)(1)(B), 24 D.C.Reg. 5334, 5362 (1977) (codified at D.C. Code § 45–1689(a)(1)(B) (1979 Supp.)); the 1980 Act, D.C.Law 3–131, § 209(a)(1)(B), 28 D.C.Reg. 326, 341 (1981) (codified at D.C.Code § 45–1519(a)(1)(B) (1981)); the 1985 Act, D.C.Law 6–10, § 208(a)(1)(B), 32 D.C.Reg. 3089, 3105 (1985) (codified at D.C.Code § 45–2518(a)(1)(B) (1986 Supp.)).

7. D.C.Code § 45–1642(a)(5) (1976 Supp.).

8. Act of August 12, 1976, D.C. Act 1–148, § 2(5), 23 D.C.Reg. 1673, 1675 (1976) (codified at D.C. Code § 45–1642(a)(3) (1978 Supp.)).

9. The 1977 Act, D.C.Law 2–54, § 205(a)(4), 24 D.C.Reg. 5334, 5353 (1977); the 1980 Act, D.C.Law 3–131, § 206(a)(3), 28 D.C.Reg. 326, 337; the 1985 Act, D.C.Law 6–10, § 205(a)(3), 32 D.C.Reg. 3089, 3099 (codified at D.C.Code § 45–2515 (1986 Supp.)).

10. The 1985 Act, D.C.Law 6–10, § 205(a)(3), 32 D.C.Reg. 3089, 3099 (codified at D.C.Code § 45–2515(a)(3) (1986 Supp.)).

11. The 1975 Act, D.C.Law 1–33, § 202(b), 22 D.C.Reg. 2490, 2502 (1975).

12. Act of August 12, 1976, D.C. Act 1–148, § 2(6), 23 D.C.Reg. 1673, 1677 (1976). To the extent that the *Frenkel* decision states otherwise, it is in error. *See Frenkel, supra,* 432 A.2d at 1230.

13. Emergency legislation of November 10, 1976, permitted claiming the exemption provided that:

within 30 days after enactment of this Act, the owner(s) of such housing accommodation shall file with the Rent Administrator a claim of exemption statement which shall consist of an oath or affirmation by such owner(s) of their valid claim to the exemption.

Act of November 10, 1976, D.C. Act 1–173, § 2(e), 23 D.C.Reg. 3608, 3611 (effective November 10, 1976).

14. The 1977 Act, D.C.Law 2–54, § 205(a)(4)(C), 24 D.C.Reg. 5334, 5353 (1977); the 1980 Act, D.C.Law 3–131, § 206(a)(3)(C), 28 D.C.Reg. 326, 337 (1981); the 1985 Act, D.C.Law 6–10, § 205(a)(3)(C), 32 D.C.Reg. 3089, 3099–3100 (1985).

a property which had been the subject of litigation prior to the tenants' complaints in this case. A summary of proceedings involving 235 Pennsylvania Avenue, S.E., is necessary to an understanding of the decision on review here.

On August 1, 1978, G. Rodney Crowther III, a tenant at 235 Pennsylvania Avenue, S.E., filed a petition in the Rental Accommodations Office ("RAO") alleging that Revithes' demand for a rent increase from $103.50 to $150 was unlawful. He claimed that Revithes had not properly registered the property under the Rental Housing Act of 1977 thus invalidating the demanded increase. In response, Revithes offered a Claim of Exemption Statement filed in July, 1978. The form required Revithes to indicate whether she had an ownership interest in any other rental unit in the District. Under oath, Donohoe & Drury, Revithes' management company, failed to indicate that Revithes also owned the building located at 233 Pennsylvania Avenue, S.E.

In a decision rendered on November 13, 1978 (the *"Crowther* decision"), a hearing examiner determined that 235 Pennsylvania Avenue, S.E., was a four-story, multi-unit structure containing three residential rental units. The hearing examiner found that Revithes also owned three residential rental units at 233 Pennsylvania Avenue, S.E. Based on those findings, the hearing examiner determined that Revithes was not exempt from rent control. Since the Claim of Exemption Statement filed in July 1978, failed to mention ownership of Revithes' second housing accommodation, it appeared to the hearing examiner that Revithes' representatives had "made possible misrepresentations as to the housing accommodation" owned by Revithes. The hearing examiner found that Revithes' violations of the registration and coverage provisions of the Act were willful. A rollback of Crowther's rent and treble damages were ordered. A new rent ceiling, equivalent to the rent prior to the increase, was assigned. The hearing examiner also ordered Revithes to properly register the housing accommodation within twenty-one days of the November 13, 1978 order.

On November 27, 1978, Donohoe & Drury filed two registration statements for 233 and 235 Pennsylvania Avenue, S.E., with the RAO. On the registration form for 233, Revithes' agent indicated that the multi-unit structure contained three rental units. The agent also indicated that the adjacent building at 235 contained only one residential rental unit. On the registration form for 235, the agent indicated that while three units had been rented there in 1973, at the current time, only one unit, presumably Mr. Crowther's, was a rental unit. Another unit was allegedly commercial and a third unit was allegedly owner-occupied. A Certificate of Occupancy for 235 Pennsylvania Avenue, S.E., which was issued on November 30, 1978, (and presumably supplemented the registration statement as required by RHC regulations), indicated that the building was used as an apartment house, with two apartments on the second floor, one apartment on the third floor, and an unused fourth floor.

At approximately the same time as the filing of the registration statements, Revithes filed a notice of appeal of the hearing examiner's November 13, 1978, decision and order. The appeal was subsequently dismissed because Revithes failed to request a stay of the order, partially failed to comply with the order, and failed to appear at the appeal hearing. In July 1979, shortly after the dismissal, Revithes sent Crowther a notice to quit. Crowther defended the eviction by arguing that Revithes was retaliating against him. In an opinion dated November 25, 1980, Judge Schwelb of the Superior Court found that Crowther had presented an unrebutted *prima facie* case of retaliatory eviction and dismissed the action for possession. *Donohoe & Drury, Inc. v. Crowther,* 108 Daily Wash.L.Rptr. 2405 (D.C.Super.Ct., November 25, 1980) (the "Superior Court decision").

That brings us to the history of the decision and order currently on review. On August 1, 1978, at the same time Revithes increased Crowther's rent, she also increased the rents of the three units at 233 Pennsylvania Avenue, S.E., from $106.50 to

$150. At that time, and at all relevant times, the three tenants residing at 233 Pennsylvania Avenue, S.E., were Christopher Church, Bessie Janis Stamper, and Igor Kozak. Despite the *Crowther* decision, which rejected Revithes' claim of exemption and set the rent ceiling at the pre-increase level, Revithes did not readjust the rent level for the "233" tenants, nor was there a refund of the excess amount charged. Instead, rent of $150 was collected for seventeen months until January 1, 1980, when the rents were increased to $160.50. Then, on August 1, 1980, Revithes raised the rents to $200.

On June 25, 1980, before taking the August 1, 1980, increase, Revithes' new property manager allegedly filed Claim of Exemption Statements for the units at 233 and 235 Pennsylvania Avenue, S.E.[15] In the June 26, 1980 notice to the tenants, the new property manager indicated that the increase was valid since the rental units were exempt from rent control limitations.

On March 16, 1981—about four months after the Superior Court decision in the Crowther eviction—the three "233" tenants filed tenant petitions with the RAO alleging that the rent increases of August 1978, January 1980, and August 1980, were taken at a time when Revithes was not properly registered and had been adjudicated not exempt from rent control.[16]

In a decision rendered in December 1981, the RAO ordered a rent refund and set the rent ceiling at $189. By agreement of the

parties, however, the RHC vacated the RAO decision and ordered a hearing de novo. Before the de novo hearing, Revithes made further filings with the agency. On May 3, 1982, Revithes allegedly filed a Claim of Exemption Statement listing three residential units at 233 and one residential unit at 235.[17] On October 5, 1982, Revithes filed a Certificate of Occupancy reflecting the conversion of two of the units at 235 from residential to commercial.

A de novo hearing was held in September 1983, and, on November 4, 1983, the hearing examiner issued a decision in favor of the tenants. The examiner determined that all three increases were taken at a time when Revithes was not properly registered and was not properly exempt. The examiner determined that Revithes did not become exempt from rent control requirements until October 1982, when she filed a valid Claim of Exemption Statement and a Certificate of Occupancy authorizing the commercial use of two of the three units at 235 Pennsylvania Avenue, S.E. All rent charged between August, 1978, and October 1982, in excess of the pre-increase base rent of $106.50 was ordered trebled and refunded. The hearing examiner also found that Revithes had willfully violated the Rental Housing Act and consequently imposed a fine of $5,000. On August 29, 1984, the RHC affirmed the decision and this petition for review followed.

---

**15.** In the record before us, only one June 25, 1980 Claim of Exemption Statement appears. The form claims an exemption for the three rental units at 233 Pennsylvania Avenue, S.E. On that form, Revithes' agent represented that Revithes held no ownership interest in any other property despite Revithes' ownership interest in 235 Pennsylvania Avenue, S.E. This apparent misrepresentation would be sufficient to invalidate the claim of exemption, and give rise to further claims of fraudulent representations, if no form for 235 Pennsylvania Avenue, S.E., accompanied this form for 233. Some representations have been made, however, that Claim of Exemption Statements for both buildings were filed on June 25, 1980. If the forms accompanied each other, no misrepresentation occurred. Since our record may simply be incomplete in its failure to contain a second Claim of Exemption Statement, we are not in a position

to invalidate the June 25, 1980, "233" Claim of Exemption Statement appearing in the record before us. On remand, of course, the RHC will be constrained to determine whether one or two Claim Statements were filed. If only one Claim Statement was filed, the exemption must fail because of the misrepresentations contained therein. If two Claim Statements were filed, however, the RHC must re-evaluate Revithes' claim of exemption for the period subsequent to June 25, 1980. *See* Part IIB, *infra.*

**16.** Tenant Christopher Church subsequently settled the suit with Revithes and therefore is not an intervenor in the action before us.

**17.** These Claim Statements do not appear in the record before us. Again, however, the record may simply be incomplete. *See* note 15, *supra.*

## II.

### THE SMALL LANDLORD EXEMPTION

Revithes primarily claims on appeal that the RHC ruled that mere ownership of more than four units, regardless of use, subjects a small landlord to rent control limitations. Revithes, however, simplifies and partially mischaracterizes the nature of the decision on review. The agency disallowed Revithes' claim of exemption on both substantive and procedural grounds. We address those in turn.

### A.

The 1977 Act was in effect when the allegedly unlawful increases were taken and the tenant petitions were filed. *See* notes 2, 3, *supra* (1977 Act effective March 16, 1978; 1980 Act effective May 1, 1981). The 1977 Act exempted from registration and coverage:

> any rental unit in any housing accommodation of four (4) or fewer units, including any aggregate of four (4) units whether within the same structure or not.[18]

D.C.Code § 45–1686(a)(4) (1979 Supp.) (the 1977 Act); *see also id.* § 45–1516(a)(3) (1981) (the 1980 Act); *id.* § 45–2515(a)(3)

(1986) (the 1985 Act). A "rental unit" was defined as:

> any part of a housing accommodation ... which is rented or offered for rent for residential occupancy.[19]

D.C.Code § 45–1681(w) (1979 Supp.) (the 1977 Act); *see also id.* § 45–1503(27) (1981) (the 1980 Act); *id.* § 45–2503(33) (1986) (1985 Act).

Revithes argues that between August 1978, and October 1982, only four of her six units were "rental units" within the meaning of the statute. Specifically, she claims that both Units 2 and 3 of 235 Pennsylvania Avenue, S.E., should have been excluded in the aggregate number of units she controlled because they were used in the following ways:

| | Unit 2 | Unit 3 |
|---|---|---|
| August 1, 1978—<br>August 1, 1979 | commercial | vacant or |
| August 1, 1979—<br>October 1980 or 1981 [20] | occupied by uncle<br>who paid no rent | commercial<br>storage |
| October 1980 or 1981—<br>October 1982 | vacant | (the entire time) |

Thus, she claims she was exempt.[21]

#### 1.

##### *Commercial units*

Revithes claims that the agency erred in failing to make a finding of fact as to

18. Because the only amendment to this language occurred in the 1985 Act and was for clarifying purposes only, our resolution of the issue raised here necessarily applies with equal force under the 1980 and 1985 Acts. *See* note 10, *supra*, and accompanying text.

19. This language was unchanged in both the 1980 and 1985 Acts. D.C.Law 3–131, § 103 (27), 28 D.C.Reg. 326, 332 (1981) (codified at D.C. Code § 45–1503 (27) (1981)); D.C.Law 6–10, § 103(33), 32 D.C.Reg. 3089, 3095 (1985) (codified at D.C.Code § 45–2503 (33) (1986)).

20. At various points in the record, Revithes or her representatives assert that the uncle died in October 1980, and at other points, they assert that he died in October 1981. We presume that this date can be determined with a greater degree of certainty.

21. It has not escaped the attention of either the agency or this court that Revithes and her representatives have made shifting, contradictory claims regarding the uses of Units 2 and 3 at 235 Pennsylvania Avenue, S.E. On the registration

statement, Unit 2 was the so-called commercial unit and Unit 3 was "owner occupied." In the closing memorandum after the September 1983 hearing, however, the "top" unit was supposedly "a storage facility, used for commercial purposes," and the "middle" unit was occupied by the landlord's brother. Now on appeal, it has been represented that in 1978, one unit was used as a storage space and one was rented for commercial purposes. Precision in labelling these units is conspicuously absent. Moreover, the claim of owner occupancy of Unit 3 in 1978 appears to have been dropped. Thus, at times, Unit 2 was the "commercial" unit in the building and at other times, a storage facility for a restaurant was the "commercial" unit in the building. Furthermore, an uncle was formerly called the occupant of the so-called "owner occupied" Unit 3 in 1978, but it is now represented that the uncle moved into Unit 2 in 1979 after the so-called commercial tenant moved out. Finally, it appears that there was effort to generate confusion by imprecise references to a fourth floor space which had no relevance to these proceedings since the agency never attempted to include this area in the aggregate number of units.

whether, from August 1, 1978, through August 1, 1979, the use of Unit 2 was residential or commercial.[22]

■ The agency in fact relied on two grounds in concluding that Revithes did not qualify for the small landlord exemption on August 1, 1978, when the first increase was taken, and in concluding that the property was improperly registered on November 27, 1978. First, both the hearing examiner and the RHC referred to the *Crowther* decision of November 12, 1978, which rejected Revithes' claim of exemption. Since Revithes never perfected an appeal of that decision, the prior determination of non-exemption was controlling.[23] Second, the hearing examiner re-examined the factual circumstances surrounding Revithes' claim of exemption in 1978 and came to an independent determination that Unit 2 was in fact used as a residence at that time. Since four other units were used as residences, Revithes was not exempt. The RHC affirmed the hearing examiner's findings.

We are persuaded that the earlier determination of non-exemption in 1978 is sufficient to bar Revithes from claiming exemption for that period. However, we deem it appropriate to review the agency's findings on the merits since the agency relied almost exclusively on the merits in its arguments before us. Furthermore, it is appro-

priate to lay to rest this landlord's long-standing protests of exemption.

■ The hearing examiner explicitly found that three tenants were residing at 233 Pennsylvania Avenue, S.E., and "at least two tenants were *residing* at 235 Pennsylvania Avenue, S.E., on the date [Revithes] filed her 1978 landlord registration statement, stating that only one tenant resided there" (emphasis added). The examiner also found that despite contrary representations on the November 1978, registration statement, none of the units was owner-occupied. She saw no need to make a finding regarding "whether or not a *sixth* tenant ever *resided* at the two addresses" (emphasis added).

The findings of the hearing examiner are more than supported by substantial evidence. D.C.Code § 1–1510(a)(3)(E) (1981); *see Remin v. District of Columbia Rental Housing Commission,* 471 A.2d 275, 277 (D.C.1984). It is undisputed that in 1978 three tenants resided at 233 Pennsylvania Avenue, S.E. It is also undisputed that Mr. Crowther lived in Apartment 1 of 235 Pennsylvania Avenue, S.E. Tenant-intervenors testified that two other tenants, a Mr. Stephen Hand and a Mr. Twynham, also resided at 235 Pennsylvania Avenue, S.E., at that time. Moreover, the tenants introduced two letters from Mr. Hand conclusively demonstrating that he resided in Apartment 2 at 235 Pennsylvania Avenue,

---

The contradictory and imprecise factual representations made by Revithes and her representatives are evidence of bad faith (at least through 1979) and, at times, just plain indifference to detail. Our determination above of Revithes' claimed uses is based on representations in the appellate brief. Even if we have incorrectly determined that these are the claimed uses, the result will remain the same. The bases for our affirmance through June 25, 1980 are substantial evidence in the record of non-excludible uses through August 1979, and procedural default. The agency will then have the opportunity to determine the true uses and occupancies of the two units in question in the post-June 25, 1980 period.

**22.** Revithes does not claim that the agency erroneously concluded that commercial units are to be counted in determining the aggregate number of units a landlord "rent[s] or offer[s] for rent for residential occupancy." Indeed, the argument would fail since the agency never attempted to include the Revithes' aggregate

number the ground floor space Revithes clearly leased as a commercial restaurant. The agency clearly recognizes that commercial units which are not used as residences are not to be counted in determining the aggregate number.

**23.** The agency also appeared to rely in part on the Superior Court decision, *Donohoe & Drury, Inc. v. Crowther, supra,* 108 Daily Wash.L.Rptr. 2405, which addressed the issue of retaliatory eviction under the 1977 Rental Housing Act. D.C.Code § 45–1699.7 (1979 Supp.) (the 1977 Act); *see id.* § 45–1562 (1981) (the 1980 Act); *id.* § 45–2552 (1986) (1985 Act). The agency's reliance was misplaced, however, since the court's holding was limited to a determination that a *prima facie* case of retaliatory eviction was made out. The court referred to the non-exempt status of Revithes' landholdings in dicta only. Since other grounds support the agency's determination of non-exemption through June 25, 1980, however, its partial reliance on the Superior Court decision is irrelevant.

S.E., throughout 1978 and until August 1, 1979.

The hearing examiner cited those two letters and the Superior Court *Crowther* decision in finding that "at least two tenants were residing at 235 Pennsylvania Avenue, S.E." Hand's letters demonstrated the residential nature of his tenancy and Revithes' actual knowledge of it.

In the first letter, dated June 25, 1979, Hand wrote:

> It is my intention to vacate this *apartment* [Unit 2] on or before July 31....
>
> I believe that an inspection of the premises will find the *apartment* to be in good, indeed better, order than when I first occupied it in November of 1977. You will find that the apartment has *shelving, refinished floors* where there is no carpeting as well as a *new mantel above the fireplace.* After 18 months, the *apartment* does need repainting....
> [Emphasis added.]

On July 25, 1979, as Hand was preparing to vacate his apartment, he wrote to the property managers:

> Herewith [are] the keys to *Apartment # 2* at 235 Pennsylvania Avenue, S.E.
> \* \* \* \* \* \*
> As indicated in my letter of June 19 ... I believe the *apartment* is in better shape than when I first occupied it on November 1, 1977.
>
> On July 13, [1979], while the movers were moving my *household goods* out of the *apartment, the owner dropped in* and I discussed with *her* certain problems I had experienced as well as her plans for renovating the *apartment.*[1]
>
> I told her that an electrician had found back in late 1977 that the overhead light wiring in the *living room* and *bedroom* were shorting out and thus the lighting fixtures were removed and the outlet boxes capped. The *living room chandelier* was refurbished and moved into the *bathroom....*
> [Emphasis added.]

■ Revithes, however, claims that she offered evidence that Hand's lease was "commercial" rather than residential. This court has previously held that even if a unit is rented under a commercial lease, the unit's actual use and occupancy as a residence, and the landlord's knowledge of such use, subjects the unit to rent control. *White v. Allan,* 70 A.2d 252 (D.C.1949). Therefore, the fact that Hand's lease may have been labeled "commercial" was, at best, irrelevant, and, at worst, evidence of a willful intention to circumvent the rental housing laws.

Thus, conclusive evidence demonstrated that at least five units at 233 and 235 Pennsylvania Avenue, S.E., were "rented ... for residential occupancy" on August 1, 1978, when Revithes increased the rents, and on November 27, 1978, when Revithes registered the properties and claimed that 235 Pennsylvania Avenue, S.E., contained only one rental unit. Since the actual rental of five, non-owner occupied, residential rental units indisputably falls outside the small landlord exemption, Revithes' cry of exemption in 1978 and through August 1, 1979, rings hollow.

### 2.

### *Vacant units*

■ The agency also explicitly rejected Revithes' claim that vacant or temporarily withheld units are not "rented or offered for rent" and thus fall outside the statutory definition of "rental unit." *See* D.C. Code § 45–1681(w) (1979 Supp.) (1977 Act); *id.* § 45–1503(27) (1981) (1980 Act). It relied on its decision in *Thompson v. Miller,* T/P 2139 (August 26, 1982), where it held that

> a landlord may not choose from among his holdings four units which he will treat as rental units, keep the other units vacant, and then claim an exemption for those four [occupied] units.

*Id.* at 4. After conducting a thorough review of the cases it had previously decided under the small landlord exemption, the agency reiterated its interpretation in *Blacknall v. Klawans,* T/P Nos. 11,632 and 11,633 (August 12, 1985). In order to discourage circumvention of the rental housing laws resulting in a reduced supply of rental units, the agency stated that "all rental units will be counted whether or not

the units are occupied, vacant, or temporarily withheld from the rental market." *Blacknall, supra,* at 6.

An agency's interpretation of the statute it administers is controlling, "unless it is plainly wrong or inconsistent with its legislative purpose." *Remin, supra,* 471 A.2d at 279 (citing *Totz v. District of Columbia Rental Accommodations Commission,* 412 A.2d 44, 46 (D.C.1980)).

The RHC's interpretation is far from plainly wrong. It must be remembered that the RHC never attempted to include in the aggregate number of rental units subject to control, the fourth floor area of 235 Pennsylvania Avenue, S.E., which the 1978 Certificate of Occupancy described as "unused." Indeed, in counting the aggregate number of units, the agency referred only to the residential rental units reflected on the 1978 Certificate of Occupancy.

The exclusion of vacant or temporarily withheld units from the aggregate number of a landlord's holdings would encourage landlords to withdraw rental units from the market in order to obtain higher rents for the remaining units. Such a result is diametrically opposed to the spirit and purpose of the rent control legislation. Prevention of the withdrawal of rental units from an already undersupplied market and moderation of rent increases were two of the primary goals specifically identified by the Council in its report accompanying the 1975 Act:

> Extension of a rent control program in the District of Columbia is a necessity, in view of the continuing housing crisis. Documentation presented to the former City Council in January 1974 indicated the following: (1) a vacancy rate in the District of Columbia so low (2.7%) as to constitute an emergency according to the U.S. Department of Housing and Urban Development; (2) a *declining supply* of low and moderate income housing and *disproportionate rent increases* among low and moderate income units. According to all indications, this *critical shortage,* particularly for lower income families, is continuing to accelerate.

HOUSING AND URBAN DEVELOPMENT COMMITTEE OF THE DISTRICT OF COLUMBIA REPORT ON BILL 1–157: RENTAL ACCOMMODATION ACT OF 1975 at 12 (July 31, 1975) (emphasis added). The twin goals have been continuously reiterated and now form a part of the Rental Housing Acts:

> The Council of the District of Columbia supports the following statutory purposes:
>
> (1) To protect low- and moderate-income tenants from the erosion of their income from increased housing costs;
>
> \* \* \* \* \* \*
>
> (4) To protect the existing supply of rental housing from conversion to other uses.

D.C.Code § 45–2502(1) and (4) (1986); *id.* § 45–1502(1) and (4) (1981). Pursuant to such a mandate, the agency delegated with the responsibility of enforcing the statute is more than entitled to determine that residential rental units which are vacant or temporarily withdrawn from the rental market are to be counted in determining the aggregate number of units under the control of a landlord.

A contrary interpretation contains no limiting principle. Most apartment units in the District are not "offered for rent" at all times. As tenants vacate, units are often temporarily withdrawn from the market for renovation purposes. Under Revithes' argument, a landlord renting five apartments in the District could suddenly raise the rents of the other four upon the temporary vacancy and rehabilitation of one of them. Such a result is plainly repugnant to the purposes of the rental housing laws, to the efficient administration of those laws, and to common sense. Moreover, such a result is inconsistent with the longstanding principle that exemptions to rental housing laws are to be narrowly construed. *Cambridge Management Co. v. District of Columbia Rental Housing Commission,* 515 A.2d 721, 723 (D.C.1986); *Remin, supra,* 471 A.2d at 279.

To the extent, therefore, that the agency determined that as a matter of law "all rental units will be counted whether or not the units are occupied, vacant, or tempo-

rarily withheld from the rental market," we defer to its reasonable interpretation of this exemption.[24]

### 3.
### *Units occupied by relatives.*

■ Determining that Revithes had procedurally defaulted on a claim of exemption, *see* Part IIB, *infra,* the agency made no findings on whether or not an uncle lived in Unit 2 after Hand vacated. Nor did it determine whether or not that uncle paid some form of "rent" for the use of the unit. Consequently, the agency came to no legal conclusions about whether and under what conditions units occupied by relatives are to be counted in determining the aggregate number. On remand, the agency may be constrained to do so, depending upon whether Unit 3 was permanently removed—rather than merely vacant—on or after June 25, 1980.[25]

### B.

The agency declined to evaluate whether the uses Revithes claimed for Units 2 and 3 after Hand left excluded those units from the aggregate number. Instead, the agency relied on procedural default. The agency determined that Revithes' claim of exemption was ineffective until October 1982,

when she filed, at the RAO, a Claim of Exemption Statement accompanied by a Certificate of Occupancy reflecting the permanent conversion of two units from residential to commercial. The agency neither mentioned nor addressed the validity of the Claim of Exemption Statements Revithes allegedly filed on June 25, 1980, and May 3, 1982.

■ A landlord, of course, bears the burden of proving qualification for exemption. *Bernstein v. Lime,* 91 A.2d 841, 843 (D.C. 1952). "A landlord's mere assertion that a unit is not a rental unit contained in a claim of exemption will be insufficient" to satisfy a landlord's burden of proof of exemption. *See Blacknall, supra,* T/P Nos. 11,632–33 at 7.

There is no question that the filing of a Certificate of Occupancy reflecting the valid conversion of two residential units to commercial units satisfies a landlord's burden of proving an exemption by credible, reliable evidence. The hearing examiner, however, did not make a finding that Revithes failed to satisfy her burden of proof of exemption until October 1982. Rather, the examiner applied a *per se* rule disallowing an exemption until the date of the filing

---

24. In proper circumstances, landlords are permitted to *permanently* remove rental units from the rental market. *See* D.C.Code § 45–1699.6(b)(5)(D) (1979 Supp.) (1977 Act); *id.* § 45–1561(i)(1) (1981) (1980 Act); *id.* § 45–2551(i)(1) (1986) (1985 Act). Thus, although vacant units are to be counted, permanently withdrawn units are not to be counted.

Determining the point in time in which a rental unit is permanently withdrawn is fairly easy when tenants occupy the unit because landlords must comply with affirmative notice requirements. D.C.Code §§ 45–1699.6(c)(1) (1979 Supp.) (1977 Act); *id.* § 45–1561(i)(1)(A) (1981) (1980 Act); *id.* § 45–2551(i)(1)(A) (1986) (1985 Act). Moreover, landlords must notify the Rent Administrator upon deciding to permanently remove a unit from residential rental use. D.C. Code § 45–1699.6(b)(5)(D)(iv) (1979 Supp.) (1977 Act); *id.* § 45–1561(i)(1)(F) (1981) (1980 Act); *id.* § 45–2551(i)(1)(F) (1986) (1985 Act). In the decision on review, the agency did not address the applicability of the reporting provision to the removal of *vacant* units, as opposed to units occupied by tenants. Instead, the agency determined that Revithes permanently removed two of her units in October 1982, when

she filed a new Certificate of Occupancy reflecting the conversion of those units from residential to commercial. In the absence of agency reliance on the affirmative reporting requirement, we decline to review the applicability of that requirement to this review, despite the District's reliance on that provision.

25. The issue of units occupied by relatives is, of course, distinct from that of owner occupancy. There is no question that a unit occupied by an owner is not "rented or offered for rent" and thus cannot be included in the aggregate number of units under the control of an owner for so long as the owner occupies the unit. *See* D.C.Code § 45–1681(w) (1979 Supp.) (1977 Act) (definition of "rental unit"). A relative, on the other hand, who pays "rent" of some form—money, goods, or services—would appear to occupy a unit that is "offered for rent," and that is consequently non-excludible. Obviously, the cornerstone of a landlord's claim for exclusion of such a unit is good faith. If a landlord provides a free rental unit in order to assist a relative in need rather than as an attempt to circumvent the rental housing laws, the unit would presumably be excluded from the aggregate number.

of a Claim of Exemption Statement and a new Certificate of Occupancy.

█ The agency could properly determine that, as a matter of law, a landlord's attempt to change his or her status does not become valid by mere recharacterization of the use of a building or unit. Specifically, every Rental Housing Act since the November 10, 1976 amendments to the 1975 Act has required "small landlords" to file Claim of Exemption Statements under the small landlord provision. *See* notes 13 and 14, *supra*, and accompanying text. Thus, to the extent the RHC invalidated Revithes' claim of exemption based on a *per se* rule that following a period of a bad faith claim of exemption, a change in status from non-exempt to exempt will become effective only upon the filing of a valid Claim of Exemption Statement, the conclusion is supported by the rental housing laws in effect then and now by sound administrative policy.[26] Since June 25, 1980 was the first time Revithes filed a Claim of Exemption Statement subsequent to Hand's tenancy, the agency's imposition of damages up to that date is supported by substantial evidence and otherwise in accordance with the law. *See* D.C.Code § 1–1510(a)(3) (1981).

█ However, we perceive no basis in either the 1977 Act or the regulations accompanying it, for a conclusion that landlords who changed the status of their rental units were on notice that a Claim of Exemption Statement had to be accompanied by a Certificate of Occupancy in order to satisfy the procedural requirements of an exemption claim.[27] Indeed, a change in status due to owner occupancy (for example) would not be reflected on a new Certificate of Occupancy since residential occupancy would not be affected. And, while *requiring* a Certificate of Occupancy to prove a permanent removal of a vacant residential rental unit from the market might greatly facilitate administration, the RHC has recently rejected such an approach.[28] *Blacknall, supra,* T/P Nos. 11,-632–33 at 7–8.

In *Blacknall,* the Commission held that a new Certificate of Occupancy was only one method by which a landlord could prove the permanent removal of a unit from residential use:

> We do not hold that [a Certificate of Occupancy] is the only method [of proof of exemption], but certainly a landlord claiming an exemption will be required to demonstrate by this method or other evidence that a unit is not in fact a rental unit within the meaning of the exemption section.

*Id.* at 7–8. Obviously, the practice of applying for and obtaining new Certificates of Occupancy in order to prove a permanent removal is strongly encouraged. Furthermore, a prospective rule requiring at least the filing of an application for a

---

**26.** Of course, the registration requirement would be triggered by a shift from an *exempt* to a *non-exempt* status. Additionally, since November 10, 1976, a change in status from exempt to non-exempt has been accompanied by an affirmative reporting requirement:

> Any change in the ownership of the exempted housing accommodation or change in the owner's interest in any other housing accommodation which would invalidate the exemption claim must be reported in writing to the Rent Administrator within 30 days of such change.

Act of November 10, 1976, D.C. Act 1–173, § 2(e), 23 D.C.Reg. 3608, 3611 (1976) (codified at D.C.Code § 45–1642(a)(3)(C) (1978 Supp.)); *id.* § 45–1686(a)(4)(C) (1979 Supp.) (the 1977 Act); *id.* § 45–1516(a)(3)(C) (1981) (the 1980 Act); *id.* § 45–2515(a)(3)(C) (1986) (1985 Act).

**27.** The 1977 Act provided the following:

> the owner(s) of such housing accommodation shall file with the Rent Administrator a claim of exemption statement which shall consist of an oath or affirmation by such owner(s) of the valid claim to the exemption. The claim of exemption statement shall also contain the signatures of each person having an interest (direct or indirect) in the housing accommodation.

D.C.Code § 45–1686 (1979 Supp.) (1977 Act); *see also id.* § 45–1516(a)(3)(C) (1981) (1980 Act); *id.* § 45–2515(a)(3)(C) (1986) (1985 Act).

**28.** Furthermore, the agency did not address nor rely on the possible applicability of the provision requiring a landlord to affirmatively notify the agency of an intention to discontinue the housing use and occupancy of a rental unit. *See* D.C.Code § 45–1561(i)(1)(F) (1981). We, therefore, decline to review its applicability. *See* note 24, *supra*.

changed Certificate of Occupancy as proof that a unit is no longer merely "vacant" but rather, permanently withdrawn, is certainly within the power of the Rental Housing Commission. At the time of the change in status here, however, no such requirement was in effect, and it was erroneous as a matter of law to elevate a form of proof to a substantive pre-condition for exemption.

We are aware, of course, that a *per se* rule requiring the filing of a valid Certificate of Occupancy reflecting a permanent removal of a rental unit from residential rental use should perhaps be invoked where bad faith is involved. Indeed, if it were clear from this record that Revithes' bad faith extended through October 1982, we would undoubtedly affirm the RHC's decision and order (subject to our disposition in Part IV, *infra* ). In this case, however, the agency did not make sufficient findings to support a claim of bad faith for the entire post-June 25, 1980 period, and it is not otherwise clear to us that Revithes' effort to circumvent the requirements of the rental housing laws was unabated until October 1982.

Of course, it may well be that, on remand, Revithes' substantial credibility problems will prevent her from satisfying her burden of proof regarding the period preceding the October 1982 filing of the Certificate of Occupancy. We direct the agency to make a finding on that question, however, rather than apply a *per se* rule requiring the filing of a Certificate of Occupancy.

■ Since the earliest possible date of Revithes' good faith filing of a valid Claim of Exemption Statement is June 25, 1980, we affirm the finding of non-exemption and the damages imposed thereon through that date. We reverse and remand for further findings subsequent to that date. The RACD and RHC are directed to determine the point in time, if ever, in which Revithes proves by credible, reliable evidence that, consistent with this opinion, the uses of two of her units at 235 Pennsylvania Avenue, were such that neither were to be counted in determining the aggregate number of units subject to Revithes' control.[29]

## III.

## THE $5,000 FINE

The RHC imposed two sanctions on Revithes for her unlawful registration and

---

**29.** The agency is reminded that it must first determine whether Revithes filed one or two Claim of Exemption Statements on June 25, 1980. *See* note 15, *supra.* If she filed only one, treble damages through December 31, 1981 (*see* Part IV, *infra* ), should be imposed. Moreover, the agency will be constrained to determine the validity of the alleged May 1982 filing.

If Revithes filed two Claim Statements on June 25, 1980, the agency should confine itself to an evaluation of the uses and occupancies of Units 2 and 3 between the period of June 25, 1980, and October 5, 1982. The uses of each unit should be evaluated separately. If, for example, the agency determines that Unit 2 should be excluded for a certain period of time because Revithes proves that the uncle lived there and paid no rent of any kind, the agency must also determine whether Unit 3 was permanently withdrawn—as opposed to merely vacant—during that time. In other words, at the same point in time, the use of each unit must be such that *neither* should be included in the aggregate number.

In light of the extensive history of litigation in this case, the parties are hereby notified that re-litigation of the issues resolved in this appeal will not be countenanced. The remand is limit-

ed to the issue stated above. Any efforts by Revithes or her representatives or agents to be less than candid, open, and precise about the dates of the uses and occupancies of the units at 235 Pennsylvania Avenue, S.E., or any efforts to generate confusion by reference to the unused fourth floor space, can and should be looked upon by the RACD and RHC with extreme disfavor. *See* note 21, *supra.* It is, of course, Revithes' burden to prove the uses of her units.

We recognize that should Revithes prove excludible uses *subsequent* to June 25, 1980 (but before the new Claim Statements filed in either May 1982, or October 1982), we are permitting the technically invalid Claim of Exemption Statements she filed on June 25, 1980, to become "valid" at the subsequent point in time. In this particular case, we are willing to countenance that result in light of the possible ambiguity in the substantive law in 1980. The applicability of rent control limitations to the vacant units of small landlords was not dispositively resolved until some two years after the June 1980 Claim of Exemption Statement was filed, *Thompson v. Miller, supra,* T/P 2139, and her assertion (if true) that one unit was occupied by a non-rent paying relative and therefore should not have been counted, is not frivolous.

improper rent increases. The rent over-charges which accrued during the period of nonexemption were trebled and ordered refunded to the tenants under the authority of § 901(a) (hereinafter "subsection (a)") of the 1977 and 1980 Acts. D.C.Code § 45–1699.24(a) (1979 Supp.) (1977 Act); *id.* § 45–1591(a) (1981) (1980 Act); *see id.* § 45–2591(a) (1986) (1985 Act). Due to the willful nature of the violations, the RHC also ordered Revithes to pay a $5,000 fine pursuant to § 901(b) (hereinafter "subsection (b)") of the 1977 and 1980 Acts. D.C. Code § 45–1699.24 (1979 Supp.); D.C.Code § 45–1591(b) (1981).

 Revithes concedes, as she must, that subsection (a) authorizes the RHC to treble rent overcharges.[30] She argues, however, that the RHC is not authorized to impose fines for willful violations because the criminal nature of the penalty compels criminal prosecution.

Subsection (b) of § 901 of the 1977 Act provided in relevant part:

(b)(1) Any person who willfully collects a rent increase after the same has been disapproved under this subchapter ... or

(2) any party who willfully makes a false statement in any document filed under this subchapter; or

(3) any person who willfully commits any other act in violation of any provision of this subchapter or of any final administrative order issued pursuant to this subchapter; or

(4) any person who willfully fails to do anything required under this subchapter, shall be fined not more than five thousand dollars ($5,000.00) for each violation.

D.C.Code § 45–1699.24(b) (1979 Supp.). Subsection (b) was unchanged in pertinent part under the 1980 Act.[31] *See* D.C.Code § 45–1591(b) (1981). Obviously, the provision is silent with respect to the appropriate mechanism for imposition and enforcement of the fine authorized. By contrast, the Rent Administrator or Commission is specifically authorized to treble rent overcharges under subsection (a). *See* note 30, *supra.*

The District of Columbia joins Revithes in arguing that the Council intended to provide civil remedies under subsection (a) while providing criminal penalties under subsection (b). It points to the legislative history of the predecessor fine provision in the 1975 Act.[32] In its section-by-section

---

**30.** Subsection (a) of § 901 of the 1977 Act (codified at D.C.Code § 45–1699.24 (1979 Supp.)) provided:

(a) Any person who:
 (1) demands or receives any rent for a rental unit in excess of the maximum allowable rent applicable to that rental unit under the provisions of title II of this subchapter; or
 (2) substantially reduces or eliminates related services previously provided for a rental unit shall be held liable by the *Rent Administrator* or *Commission,* as applicable, for treble the amount by which the rent exceeds the applicable rent ceiling or for seventy-five dollars ($75.00), whichever is greater and/or for a rollback of the rent to such amount as the *Rent Administrator* or *Commission* shall determine.

Emphasis added. Subsection (a) of § 901 of the 1980 and 1985 Acts likewise authorizes the Rent Administrator or Rental Housing Commission to treble damages. D.C.Code § 45–1591(a) (1981); *id.* § 45–2591(a) (1986). Effective July 17, 1985—the effective date of the 1985 Act—treble damages are permitted only in the event of bad faith. *Id.* The regulations corresponding to the 1985 Act require detailed findings of fact on the issue of bad faith. *See* 14 DCMR 4217.2 (1986).

**31.** In large part, the provision is the same under the 1985 Act. D.C.Code § 45–2591(b) (1986). An amendment to the 1985 Act, however, clearly authorizes the RACD and RHC to impose fines. *See* note 35, *infra,* and accompanying text.

**32.** The penalty provisions of the 1975 Act provided as follows:

 (a) Any person who—
 (1) demands or receives any rent for a rental unit in excess of the maximum allowable rent applicable to that rental unit under the provisions of this subchapter, or
 (2) substantially reduces or eliminates related services previously provided for a rental unit, shall be held liable by the Rent Administrator for treble the amount by which the rent exceeded the applicable rent ceiling or for $50, whichever is greater.
 (b) Any person who—
 (1) willfully makes a false or misleading statement in any registration statement or other statement filed under this subchapter, or
 (2) willfully commits any other action in violation of this subchapter, or willfully fails to do anything required under this subchapter; shall be fined not more than $5,000 for each violation.

analysis of the 1975 Act, the Council explained that in subsection (a) it "wished to provide incentives for tenants to pursue their rights under the act. [We], therefore, provided civil remedies in addition to criminal sanctions." HOUSING AND URBAN DEVELOPMENT COMMITTEE OF THE DISTRICT OF COLUMBIA, REPORT ON BILL 1–157: RENTAL ACCOMMODATIONS ACT OF 1975 at 37 (July 31, 1975). Since the only other sanction provided for in the 1975 Act was the fine provision of subsection (b), the Council was obviously referring to the fines when it spoke of the criminal sanction.

If we were writing on a clean slate, we would find this legislative history very persuasive. This court, however, has previously determined that the RHC is authorized to impose fines under subsection (b) of the 1975 Act. *Smith v. District of Columbia Rental Accommodations Commission*, 411 A.2d 612 (D.C.1980). Since the fine provision was not amended in any relevant manner in the 1977 or 1980 Acts, we are bound by this court's prior determination. *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971).

In *Smith*, tenant-petitioners sought review of an RHC decision in which the RHC, *inter alia*, declined jurisdiction over the tenants' claim of retaliatory eviction. In deliberately declining jurisdiction, the RHC concluded that "the sole remedy for a violation of the prohibition against landlord retaliatory action is the imposition of a penalty upon conviction after a trial de novo of the law and the facts pertaining to the offense." The agency also concluded that it lacked statutory authority to enforce an order restraining the landlord from continuing retaliatory action.

We specifically rejected both the RHC's grounds for its lack of jurisdiction:

We hold that the Commission erred as a matter of law in concluding that it had no statutory authority to enforce its orders. In addition, *we are aware of no law*, and none has been cited to us, *to indicate that a trial de novo is required to impose the penalties* prescribed by ... D.C.Code 1978 Supp., § 45–1655(b) [the fine provision at issue here].[6]

[6] Further the fine appears to be a civil penalty that does not involve a conviction.

*Smith, supra*, 411 A.2d at 616 (emphasis added). We then reversed and remanded the RHC's decision.

There is no question that in remanding in *Smith*, we concluded not only that the RHC had jurisdiction to review retaliatory actions, but also that it had authority to enforce orders and impose fines for violations of the prohibitions against retaliatory actions. *Smith* provided an unmistakable signal to the RHC that de novo criminal prosecution pursuant to subsection (b) was unnecessary. Only the *en banc* court can overrule such a decision.[33]

Despite the legislative history of the penalty provisions, the *Smith* interpretation of subsection (b) is by no means unreasonable or otherwise contrary to the law.[34] It has long been established that administrative agencies may be authorized to impose penalties in the form of fines to enforce public rights created by statutes. *See Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938); 1 K.C. DAVIS, ADMINISTRATIVE LAW TREATISE § 3.11 (2d ed.

---

D.C.Code § 45–1655(b) (1976 Supp.) (D.C.Law 1–33, § 215(b), 22 D.C.Reg. 2490, 2531 (1975)).

**33.** The District rather summarily argues that the language in *Smith* is pure dicta. We cannot agree. In *Smith*, this court specifically rejected both of the RHC's grounds for lack of jurisdiction. Perhaps the same result could have been reached by merely rejecting one of the grounds, but we did not do so.

**34.** Of course, the Rental Housing Commission and the Rent Administrator are not precluded

from referring willful violations of the rental housing laws to the Corporation Counsel for prosecution. The current regulations provide:

Where it has been determined that any person has willfully committed any act specified in §§ 901(b) and (e) of the Act, both the Rent Administrator and the Commission are authorized to refer the matter to the Corporation Counsel of the District of Columbia for criminal prosecution.

14 DCMR § 4217.4 (1986).

1978). Moreover, the Council's explicit authorization of the RHC's power to impose treble damages, which sometimes exceed $5,000, indicates the Council's intent to authorize RHC authority over sizeable "civil" penalties. Denial of RHC power to impose a $5,000 fine merely because the fine is allegedly a "criminal" penalty, therefore, could be viewed as an elevation of form over substance. Finally, judicial economy and efficiency is better served by authorizing an agency to impose fines rather than requiring the agency to refer violations to the Corporation Counsel or the United States Attorney for possible prosecution. Indeed, pursuant to an amendment to the 1985 Act, the RHC is indisputably authorized to impose fines pursuant to subsection (b) or any other provision of the penalty section.[35] Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985, D.C.Law 6–42, § 408, 32 D.C.Reg. 4450, 4457 (1985) (codified at D.C.Code § 45–2591(f) (1986)).

■ Revithes next argues that the fine was issued in violation of her right to due process because she had no notice that a willful violation of the law was at issue. The record refutes her claim, however, because the original notice, which was accompanied by a copy of the tenant petitions, informed Revithes that "[a]ny willful violations of the Act or failure to comply may result in a fine of not more than $5,000." Such notice was sufficient to satisfy due process and the requirements of D.C.Code § 1–1509(a) (1981).

■ Finally, Revithes argues that substantial evidence does not support the finding of willful violations here. We disagree. The Rent Stabilization Program and registration requirement became effective in 1975. Three years later, after a tenant complaint and an adverse ruling on her exemption claim, Revithes finally filed a registration statement. In that statement, she misrepresented the use and occupancy of her units at 235 Pennsylvania Avenue, S.E. She then retaliated against the tenant who filed the tenant complaint. *Donohoe & Drury, supra.* Simultaneously, she disregarded the holding of the 1978 *Crowther* decision by increasing the rents of the tenants at 233 Pennsylvania Avenue, S.E.

---

**35.** Section 408 of the Civil Infractions Act provides in relevant part:

Section 901 of the Rental Housing Act of 1985 ... is amended by adding a new subsection (f) to read as follows:

(f) Civil fines, penalties, and fees may be imposed as alternative sanctions for any infraction of subsection (a) through (e) of this section, or any rules or regulations issued under the authority of this section, pursuant to titles I–III of the Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985. *Adjudication of any infraction of this section shall be pursuant to titles I–III of the Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985.*

Titles I–III provided for typical administrative procedures, not criminal actions.

We reject the contention that the Council's passage of the Civil Infractions Act amending the 1985 Rental Housing Act compels the conclusion that the RHC was not authorized to impose fines under the prior rental housing acts. The Civil Infractions Act was designed to "provide for a uniform and expeditious system of administrative adjudication with respect to" infractions of laws which the Department of Consumer and Regulatory Affairs was authorized to enforce. COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS OF THE DISTRICT OF COLUMBIA, COMMITTEE REPORT ON BILL 6–187 "DISTRICT OF CO-

LUMBIA CONSUMER AND REGULATORY AFFAIRS CIVIL INFRACTIONS ACT OF 1985" at 2 (June 11, 1985) ("DCRA COMMITTEE REPORT"). The Act was primarily directed toward expansion of the enforcement power of the Department of Consumer and Regulatory Affairs (DCRA) which was created in 1983 for the purpose of consolidating all regulatory functions into one entity. *Id.;* Reorganization Plan 1 of 1983, 30 D.C.Reg. 374 (1983). In enacting the Civil Infractions Act, the Council stated: "One of the most glaring problems faced by DCRA [is] the inability to enforce its statutory mandates. A review of comparable regulatory agencies reveal[s] that most have substantial enforcement powers including fine authority. DCRA's power is limited to suspension, revocation, denial, refusal to renew licenses and permits, and lastly, criminal prosecution." DCRA COMMITTEE REPORT at 2. Clearly, the RHC's authority was not limited to the extent described in the Committee's report since the RHC unquestionably had power to impose treble damages. Moreover, the Civil Infractions Act did not purport to specifically review the prior authority of the RHC, but rather, to guarantee authority to impose fines in a simple and uniform fashion under all the 92 laws the Act amended at the time of its passage. *See id.* at 7–13 (listing 92 laws which the Act amended to provide authority to impose civil fines, penalties, and fees).

Even assuming that a claim of exemption may lie for the period subsequent to the filing of the 1980 Certificate of Exemption Statements, Revithes' conduct prior to that time provides substantial evidence to support the conclusion of willful violations.

## IV.

### DAMAGES SUBSEQUENT TO JANUARY 1, 1982

■ If on remand, Revithes does not satisfy her burden of proving an exemption prior to January 1, 1982, the agency must nevertheless impose only a single damage award for the period subsequent to January 1, 1982, for which Revithes remains non-exempt.

Tenant petitions in this action were filed on March 16, 1981, and a hearing was held on June 1, 1981. In a December 23, 1981 decision rendered pursuant to that hearing, the RAO fixed Revithes' "rent ceiling" at $189. In reliance upon that decision, Revithes started collecting rent of $189 on January 1, 1982.

Due to numerous errors, the original decision was vacated by mutual agreement. A de novo hearing resulted in the decision which is the subject of this review. In that decision—which we affirm in part—the agency determined that the true rent ceiling should have been set at $106. Despite the fact that Revithes had relied on the earlier erroneous decision in collecting rent of $189 between January 1982, and October 1982, the RHC trebled the rent refunds during that time.[36] The trebling of the damages was clearly erroneous.

The regulations in effect at the time of this decision provided for the trebling of damages in the following circumstances:

Refunds of rent shall be trebled unless the surrounding circumstances of the violation(s) indicate that the landlord acted in good faith, and that good cause exists for providing a single award.[37]

14 DCMR § 3410.2 (1985). Regardless of the good or bad faith of Revithes prior to January 1, 1982, her reliance upon the agency's erroneous establishment of a rent ceiling of $189 as of January 1, 1982, and her subsequent collection of that rent, indicate that Revithes acted in good faith and constitute good cause for the single rent refund.

This court's decision in *Harris v. District of Columbia Rental Commission,* 505 A.2d 66 (D.C.1986), is not to the contrary. There, the landlord sought relief from the damages which resulted from the administrative delay between the time of the initial hearing and the decision thereon. By contrast, here, an erroneous decision was rendered, it was relied upon, and treble damages were nonetheless imposed for the post-decision period. Under the regulations in effect at the time, such a result is untenable.

Consequently, if the agency determines on remand that Revithes has not in fact satisfied her burden of proving an exemption until sometime after January 1, 1982, the agency must nonetheless vacate the award of treble damages for the period subsequent to January 1, 1982.

## V.

Thus, we affirm the finding of non-exemption and the damages imposed thereon for the period up to and including June 25, 1980. We affirm the imposition of a $5,000 fine. We reverse and remand for proceedings consistent with this opinion for the time period after June 25, 1980.

*So ordered.*

---

36. Specifically, the hearing examiner determined that the difference between the base rent of $106.50 (which was equivalent to the rent ceiling since no proper increases had purportedly been taken) and the collected rent of $189 was $82.50. The $82.50 was then multiplied by ten (10) months (January, 1982 through October, 1982) for a total of $825 in rent overcharges. The $825 was trebled ($2,475) and ordered refunded to two (2) tenants for a total of $4,950 in damages (excluding the interest computation).

37. Under the 1985 Act, the trebling of rent refunds operates quite differently. *See* note 30, *supra.*