Peter ESPENSCHIED, Appellant,

v.

Raj MALLICK, et al., Appellees.

Nos. 90–CV–1247 & 91–CV–281.

District of Columbia Court of Appeals.

Submitted Feb. 11, 1993.

Decided Nov. 18, 1993.

---

1. Both *Thomas* and *Green* applied *Terry* principles in upholding a limited search (more like a "frisk") of a car.

Morris R. Battino, Washington, DC, was on the brief for appellant.

Lisa J. Dessel, Washington, DC, was on the brief for appellee.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

This appeal arises from the Superior Court's grant of summary judgment in favor of appellees, Raj and Theodora Mallick, in their action for possession of real property against appellant, Peter Espenschied. Appellant contends that the trial court erred (1) by denying appellant's motion to quash service of process, and (2) by failing to consider appellee's claim of retaliatory eviction.[1] We affirm.

Appellant was a commercial tenant operating a bookstore in a mixed-use building owned and managed by appellees, located at 2603 Connecticut Avenue, N.W., Washington, D.C. Appellant's lease expired on December 31, 1989, and specifically permitted "the Lessor [to] re-enter and repossess the said land and premises without notice or demand thereof."[2] At the expiration of his lease term, appellant was notified that his monthly rental payments would increase from $656.25 to $1200. Appellant's refusal to pay the increase prompted this litigation and his subsequent eviction.[3]

## I.

The facts, as credited by the trial court during a hearing on appellant's motion to quash service of process, indicate that on April 27, 1990, Mr. Joseph Green, a process server with more than twelve years of experience, went to the premises to serve appellant with the summons and complaint for possession. After being informed that appellant was in Florida and that Mr. Hitchcock, appellant's employee, was authorized to receive service, he left the summons and complaint with Mr. Hitchcock.

D.C.Code § 16–1502 (1990) provides: "If the defendant has left the District of Columbia, or cannot be found, the summons may be served by delivering a copy thereof to the tenant, or by leaving a copy with some person above the age of sixteen years residing on or in possession of the premises sought to be recovered." The trial court did not err in finding that appellees' service of process complied with the statute and, accordingly,

---

1. Appellant's additional claim that the trial court erred by allowing the landlord to issue a writ of restitution after the ninety-day period prescribed by Super.Ct. L & T R. 16(d) elapsed, is without merit in light of the record which reveals that each time a writ of restitution expired, a new writ was filed.

2. See D.C.Code § 45–1410 (1990) which provides that "[w]henever a lease for any definite term shall expire, or any tenancy shall be terminated by notice as aforesaid, and the tenant shall fail or refuse to surrender possession of the leased premises, the landlord may bring an action of ejectment to recover possession in the Superior Court of the District of Columbia." We have held this provision applicable to commercial as well as residential tenancies. See Simpson v. Lee, 499 A.2d 889 (D.C.1985).

3. Appellant's "involuntary departure from the premises does not render this appeal moot." Joyner v. Jonathan Woodner Co., 479 A.2d 308, 310 (D.C.1984) (citing Zanakis v. Brawner Bldg., Inc., 377 A.2d 67, 68–69 (D.C.1977)). See also

we find no error.[4]  *See Alexander v. Polinger Co.*, 496 A.2d 267, 269–70 (D.C.1985); *Parker v. Frank Emmet Real Estate*, 451 A.2d 62 (D.C.1982).

## II.

Appellant's second contention is that, by granting summary judgment to appellees, the trial court improvidently failed to consider the applicability of a retaliatory eviction defense to commercial leases.  Appellant asserts that, by dramatically raising his rent, appellees were retaliating because of

> "(1) [appellant's] assistance to the Perry family, residential tenants in the building until about 1985, in their successful defense against the [appellees] in this Court, (2) [appellant's] assistance to the Shah family, residential tenants in the building until 1988, in pursuing housing violation complaints, (3) [appellant's] own follow-up of the Shahs' complaints, which resulted in orders from the housing inspector to repair the main entrance stairway ..., and (4) [appellant's] own numerous written and oral complaints about damage and deficiencies in the building structure...."[5]

Conceding that "the D.C. Housing Code and D.C.Code Section 45–2552 only create an explicit retaliatory eviction defense in residential tenancy cases," appellant propounds "an implied, common law retaliatory eviction defense" under *Edwards v. Habib*, 130 U.S.App.D.C. 126, 397 F.2d 687 (1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969), which, he argues, "should be extended to commercial tenancies in this jurisdiction."

In *Edwards*, the landlord commenced eviction proceedings against a month-to-month tenant after her complaint to housing authorities led to the discovery of more than forty sanitary code violations.  The United States Court of Appeals for the District of Columbia overturned the ruling in the landlord's favor and held that a tenant could offer evidence of the landlord's retaliation or other improper motive as a defense to the possessory action.  Reasoning that "[t]o permit retaliatory evictions, then, would clearly frustrate the effectiveness of the housing code as a means of upgrading the quality of housing in Washington[,]" *id.*  130 U.S.App. at 139–140, 397 F.2d at 700–701, the court held that although the landlord could evict for any legal reason or for no reason at all, Congress, in providing jurisdiction over possessory actions, did not intend to permit evictions in retaliation for a tenant's report of housing code violations to authorities.  In short, "the underlying rationale of th[e] [*Edwards*] decision is that the Housing Regulations in this jurisdiction were promulgated at the explicit direction of Congress; their purpose is to secure safe and sanitary housing for the housing dwellers; effective implementation of these regulations depends in part on the private reporting of violations; ... to permit [retaliatory] evictions would undercut the effectiveness of the housing code." *Golphin v. Park Monroe Assocs.*, 353 A.2d 314, 317 (D.C.1976) (footnote and citation omitted).  *See* R. SCHOSHINSKI, AMERICAN LAW OF LANDLORD & TENANT §§ 12:2, at 721 (1980).

Since *Edwards*, many states have protected tenant rights either by promulgating statutes which provides protection for tenancy-related activities,[6] by directly applying the

---

*King v. Jones*, Dkt. No. 91–CV–416 (D.C. June 10, 1993).

**4.** It is of no moment that appellant and Mr. Hitchcock's testimony contradicted that given by Mr. Green.  We have held that "[c]redibility determinations are within the province of the trier of fact and may not be disturbed unless plainly wrong or without evidence to support them." *Rubin v. Lee*, 577 A.2d 1158, 1160 (D.C.1990) (citing D.C.Code § 17–305 (1981)).

**5.** Super. Ct. L & T R. 5(b) provides:
  In actions in this branch for recovery of possession of property in which the basis of recovery is nonpayment of rent or in which there is joined a claim for recovery of rent in arrears,

the defendant may assert an equitable defense of recoupment or set-off or a counterclaim for a money judgment based on the payment of rent or on expenditures claimed as credits against rent or for equitable relief related to the premises.  No other counterclaims, whether based on personal injury or otherwise, may be filed in this branch.  This exclusion shall be without prejudice to the prosecution of such claims in other branches of the court.

**6.** *See* Alaska Stat. § 34.03.310; Ariz.Rev.Stat. Ann. § 33–1381; Cal.Civ.Code § 1942.5; Conn. Gen.Stat.Ann. § 47a–20; Del.Code Ann. tit. 25, § 5516; D.C.Code § 45–2552; Fla.Stat.Ann. § 83.64; Haw.Rev.Stat. § 521–74; Iowa Code Ann. § 562A.36; Kan.Stat.Ann. § 58–2572; Ky.

*Edwards* rationale,[7] or by implying such rights from the tenant's right of habitability.[8] In light of appellant's concession that the statutory scheme proscribing retaliatory conduct is limited to the residential sector,[9] we now turn to consider the latter two theories

Rev.Stat.Ann. § 383.705; Md.Real Prop.Code Ann. § 8–208.1; Mass.Gen.Laws Ann. ch. 186, § 18; Minn.Stat.Ann. § 566.03; Mo.Ann.Stat. § 441.620; Mont.Code Ann. § 70–24–431; Neb. Rev.Stat. § 76–1439; Nev.Rev.Stat.Ann. § 118A.510; N.H.Rev.Stat.Ann. § 540:13–a; N.J.Stat.Ann. § 2A:42–10.10; N.M.Stat.Ann. § 47–8–39; N.Y.Real Prop.Law § 223–b; N.C.Gen.Stat. § 42–37.1; Ohio Rev.Code Ann. § 5321.02; Or.Rev.Stat. § 91.865; Pa.Stat.Ann. tit. 68, § 250.205; R.I.Gen.Laws § 34–18–46; S.C.Code Ann. § 27–40–910; Tenn.Code Ann. § 66–28–514; Tex.Prop.Code Ann. § 92.057; Vt. Stat.Ann. tit. 9, § 4465; Va.Code Ann. § 55–248.39; Wis.Stat.Ann. § 704.45.

7. *See, e.g., Schweiger v. Superior Court of Alameda County*, 3 Cal.3d 507, 90 Cal.Rptr. 729, 476 P.2d 97 (1970) (tenant exercising statutory repair-and-deduct remedy is protected against retaliatory rent increase and eviction); *Markese v. Cooper*, 70 Misc.2d 478, 333 N.Y.S.2d 63, 73 (Monroe County Ct.1972) (defense of retaliatory eviction allowed in summary possession action); *Dickhut v. Norton*, 45 Wis.2d 389, 173 N.W.2d 297 (1970) (retaliatory eviction allowed as defense to unlawful detainer action); *Toms Point Apartment v. Goudzward*, 72 Misc.2d 629, 339 N.Y.S.2d 281 (Dist.Ct.Nassau 1972) (retaliatory eviction may be found where: (1) tenant exercised constitutional right, (2) grievance is bona fide, serious, reasonable, and founded in fact, (3) condition underlying grievance was not created by tenant, (4) grievance must be present at commencement of eviction, (5) landlord's primary purpose in seeking eviction is to retaliate for tenant's exercise of constitutional right); *Portnoy v. Hill*, 57 Misc.2d 1097, 1098, 1100, 294 N.Y.S.2d 278, 279, 281 (1968) (retaliation for tenant's reporting of code violation is an affirmative defense); *Sims v. Century Kiest Apartments*, 567 S.W.2d 526, 527, 532 (Tex.Civ.App.1978) (tenant may bring a cause of action for termination due to retaliation by the landlord for tenant's reporting code violation to city authorities); *Alteri v. Layton*, 35 Conn.Supp. 261, 408 A.2d 18 (1979) ("repairs required to conform a dwelling unit to basic structural, mechanical and housing code regulations are type of repairs which were contemplated by the legislature and which raise the presumption of retaliatory defense"); 40 A.L.R.3d 740 (1970 & 1992 Supp.).

8. *See, e.g., Imperial Colliery v. Fout*, 179 W.Va. 776, 373 S.E.2d 489, 493 (1988) ("If the right to habitability is to have any meaning it must enable the tenant to exercise that right by com-

and any consequences they may have on the instant action.

## A.

■ After an exhaustive review of housing

plaining about unfit conditions without fear of reprisal by his landlord."); *Robinson v. Diamond Hous. Corp.*, 150 U.S.App.D.C. 17, 24, 463 F.2d 853, 862 (1972) ("If the housing code were effectuated solely by a system of comprehensive public enforcement, the situation might perhaps be different. But by legislating a system of private remedies conforming to the *Javins v. First Nat'l Realty Corp.*, 138 U.S.App.D.C. 369, 428 F.2d 1071 (D.C.), *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970) and *Brown v. Southall Realty*, 237 A.2d 834 (D.C.1968) decisions, the City Council has made plain that the code is to be enforced in large part through the actions of private tenants.") (footnotes omitted).

9. D.C.Code § 45–2552 provides:

(a) No housing provider shall take any retaliatory action against any tenant who exercised any right conferred upon the tenant by this chapter, by any rule or order issued pursuant to this chapter, or by any other provision of law. Retaliatory action may include any action or proceeding not otherwise permitted by law which seeks to recover possession of a rental unit, action which would unlawfully increase rent....

Subsection (b), in turn, specifies certain actions by a landlord which will lead to a presumption of retaliatory eviction. As appropriate to the instant action, these acts include those situations where, "if within the 6 months preceding the housing provider's action, the tenant":

(1) Has made a witnessed oral or written request to the housing provider to make repairs which are necessary to bring the housing accommodation or the rental unit into compliance with the housing regulations;

(2) Contacted appropriate officials of the District government ... concerning existing violations of the housing regulations in the rental unit the tenant occupies or pertaining to the housing accommodation in which the rental unit is located, or reported to the official suspected violations which, if confirmed, would render the rental unit or housing accommodation in noncompliance with the housing regulations:

\*   \*   \*   \*   \*   \*

(5) Made an effort to secure or enforce any of the tenant's rights under the tenant's lease or contract with the housing provider[.]

It is clear that, "as defined by statute, the defense of retaliatory eviction is available only to residential tenants. *See* D.C.Code §§ 45–2503(15), (33), (36), 45–2552 (1986)." *Ontell v.*

regulations,[10] Congressional reports,[11] legal commentaries,[12] and judicial precedent,[13] the court in *Edwards* concluded that retaliatory eviction was anathema to the goals sought to be advanced by local sanitary and safety codes, particularly in light of the "appalling condition and shortage of housing in Washington, the expense of moving, the inequality of bargaining power between tenant and landlord, and the social and economic importance of assuring at least minimum standards in housing conditions." *Id.*, 130 U.S.App. D.C. at 140, 397 F.2d at 701. Emphasizing the essential role performed by tenants who are uniquely positioned to vouchsafe that landlords respect these "minimum standards," the court concluded that the critical policy considerations underlying safe and habitable housing outweigh any competing policy interest in preserving the summary nature of unlawful detainer actions.

Accordingly, the test subsequently adopted by courts confronted with an *Edwards*-like situation is "whether the public policies furthered by protecting defendants from eviction outweigh the interests in preserving the summary nature of unlawful detainer proceedings." *S.P. Growers Ass'n v. Rodriguez*, 17 Cal.3d 719, 131 Cal.Rptr. 761, 762, 552 P.2d 721, 723 (1976). The pattern which has emerged from the burgeoning case law following *Edwards* is that where the public policy implicated involves housing code violations, residential tenants are generally accorded the right to mount a retaliatory defense. *See* note 5, *supra.* Where the protected activity is more tenuously related to the basic decent-housing concern, however, the courts appear to scrutinize more carefully both the underlying value of the particular policy as well as the importance of the tenant's role in vindicating that policy.[14] *See* 2 POWELL ON REAL PROPERTY ¶ 234[1](a).

*Capitol Hill E.W. Ltd.*, 527 A.2d 1292, 1294 n. 2 (D.C.1987).

**10.** The Commissioners of the District of Columbia hereby find and declare that there exist *residential* buildings and areas within said District which are slums or are otherwise blighted....

... [S]uch unfortunate conditions are due, among other circumstances, to certain conditions affecting such *residential* buildings and such areas, among them being the following: dilapidation, inadequate maintenance, overcrowding, inadequate toilet facilities, inadequate bathing or washing facilities, inadequate heating, insufficient protection against fire hazards, inadequate lighting and ventilation, and other insanitary or unsafe conditions....

... [Which] ... are deleterious to the health, safety, welfare and morals of the community and its inhabitants.

*Edwards, supra*, 130 U.S.App.D.C. at 139, 397 F.2d at 700 n. 40 (quoting D.C.Code § 2101 (1956) (emphasis added)).

**11.** Poor families are responding to Washington's housing shortage by doubling and overcrowding; by living in structurally substandard or other hazardous housing; by sharing or doing without hot water, heat, light, or kitchen or bathroom facilities; by farming out their children wherever they can; by denying their children exist to landlords and public officials; by paying rents which are high compared to incomes so they must sacrifice other living necessities; and by living without dignity or privacy. Each one of these features had been measured separately or has been observed in Washington's poverty areas.

*Edwards, supra*, 130 U.S.App.D.C. at 140, 397 F.2d at 701 n. 45 (quoting *Report of the National*

*Capital Planning Commission, Problems of Housing People in Washington, D.C.*).

**12.** "[T]he need for increased private and group participation in code enforcement has been widely recognized. Gribetz and Grad, *Housing Code Enforcement: Sanctions and Remedies*, 66 COLUM L.REV. 1254 (1966); Note, *Enforcement of Municipal Housing Codes*, 78 HARV.L.REV. 801, 843–860 (1965). *See also* Sax and Hiestand, *Slumlordism as a Tort*, 65 MICH.L.REV. 869 (1967)." *Edwards, supra*, 130 U.S.App.D.C. at 139–40 n. 43, 397 F.2d at 700–01 n. 43.

**13.** "Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden.... The misery of housing may despoil a community like an open sewer may ruin a river. *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954)." *Edwards, supra*, 130 U.S.App.D.C. at 140 n. 47, 397 F.2d at 701 n. 47.

**14.** The same analysis has been upheld in other contexts. *See L'Orange v. Medical Protective Co.*, 394 F.2d 57 (6th Cir.1968), where the Circuit held that cancelling the policy of an Ohio dentist because the insured testified in a malpractice suit against a colleague insured by the same company contravened public policy; *Petermann v. International Bhd. of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959), which overturned a union's firing one of its employees for refusing to give false testimony before a legislative investigating committee as void against California's policy against perjury.

A clear application of the latter strategy can be seen in *S.P. Growers, supra,* where the tenants asserted that the landlord was seeking to evict them in retaliation for the tenants filing suit under the federal Farm Labor Contractor Registration Act. After carefully analyzing the Farm Labor Act's history and noting that a section had been amended to the act which provided for private civil remedies, the court concluded that a retaliatory defense was appropriate because "the federal act relies in large part on the initiation of private litigation for its effectiveness." Again, in *Barela v. Superior Court,* 30 Cal.3d 244, 178 Cal.Rptr. 618, 636 P.2d 582 (1981), the Supreme Court of California held that the trial court should have considered a retaliatory defense which averred that the landlord was evicting the tenant in retaliation for the tenant's complaint to the police that the landlord had sexually assaulted her nine-year-old daughter. In addition to the important public policy that "[c]itizens have a right and a duty to report violations of the law to the authorities," the court cited the California legislature's goal "to encourage victims to report crimes," and reasoned accordingly that "[t]he effective enforcement of this state's criminal laws depends upon the willingness of victims and witnesses to report crime and to participate in the criminal justice system." 636 P.2d at 586.

The California courts then applied this analytical framework to the commercial sphere in *Custom Parking, Inc. v. Superior Court of California,* 138 Cal.App.3d 90, 187 Cal.Rptr. 674 (1982), where a commercial tenant was threatened with eviction after his employees and officers refused to perjure themselves in the landlord's favor. Acknowledging the historical schism between commercial and residential tenants, the court nonetheless enunciated the strong public policy favoring truthful testimony which rendered insignificant any distinctions. The court concluded that "to preclude the defense would be to create a class of litigants, commercial landlords, with a legally sanctioned means of punishing tenants who testify honestly but adversely to the landlord and third parties." *Id.,* 138 Cal. App.3d at 101, 187 Cal.Rptr. at 682.

In a similar vein, the Supreme Court of Hawaii extended the right to interpose a retaliatory defense to a commercial tenant in *Windward Partners v. Delos Santos,* 59 Haw. 104, 577 P.2d 326 (1978), where a landlord terminated the tenancy of the tenant who publicly testified, pursuant to statute, against the landlord's pecuniary interests at an agency hearing. After carefully chronicling the strong public policy favoring testimony before agencies and commissions and noting that in *Windward,* "as in *Edwards v. Habib, supra,* the effectiveness of the statute HRS § 205–4 depends primarily on private initiative[,]" *id.,* 577 P.2d at 333, the court found that a retaliatory defense was mountable, and because the statutory right to testify was "equally applicable to non-residential tenants," *id.,* at 334, the court perceived "no justifiable legal premise[ ] to distinguish between the two classes of tenants." *Id.*

Here, appellant argues that "[i]f a tenant, including a commercial tenant, cannot seek to force a landlord to comply with the construction codes [D.C.Code § 5–1301 *et seq.* and Titles 12 and 21 of the DCMR (1991) ], for fear of retaliatory consequences, then the public policy expressed would be thwarted." In particular, appellant focuses on D.C.Code § 5–1304 which provides:

The Construction Codes shall be construed to secure their expressed intent, which is to ensure public safety, health, and welfare by building construction, through structured strength, energy and water conservation, accessibility to the physically handicapped, adequate egress facilities, sanitary equipment, light ventilation, and fire safety; and, in general, to secure safety to life and property from all hazards incident to the design, erection, repair, removal, demolition, or use and occupancy of buildings, structures, or premises.

While appellant's argument has superficial appeal, it overlooks the fundamental differences between the two codes and, most importantly, the enforcement role played by commercial tenants as opposed to residential tenants. Unlike the Housing Code which "unquestionably was designed to protect tenants' interests (as well as the public health

and safety)," *Lee v. District of Columbia Bd. of Appeals*, 423 A.2d 210, 218 (D.C.1980), and to which the legislature has enacted a specific system of private remedies indicating that the code is intended to be enforced by those whom it seeks to protect, *see* 14 DCMR § 101 *et seq.* & Housing Regulations, 5G DCRR § 2901 (August 11, 1955), "[n]othing in the applicable statute or regulations creates a special class of persons protected by the building code other than the general public," *see District of Columbia v. Forsman*, 580 A.2d 1314, 1317 (D.C.1990), nor is enforcement designed to be initiated by anyone other than the Director of the Department of Housing and Human Development. *See* 12 DCMR § 111 *et seq.*

Moreover, appellant has failed to adduce any evidence indicating there exists the commercial analogue of the comprehensive findings which inspired *Edwards, i.e.,* "appalling condition and shortage[s]" and "the inequality of bargaining power between tenant and landlord, . . ." *Edwards*, 130 U.S.App.D.C. at 140, 397 F.2d at 701.[15] Accordingly, we decline appellant's invitation to extend *Edwards* to the instant action.

### B.

■ Similarly, we decline to extend to commercial tenants the right to interpose a retaliatory eviction defense based on a

breach of the "warranty of habitability." Despite having tempered the harsh effects of the theory of independent covenants and implied a warrant of habitability into all residential leases, *see Javins, supra* note 8; *Winchester Management v. Staten*, 361 A.2d 187 (D.C.1976),[16] we have never accorded the same consideration to commercial leases.

For example, in *Interstate Restaurants, Inc. v. Halsa*, 309 A.2d 108 (D.C.1973), the landlord sought possession following the tenant's default under a lease provision requiring that the leased restaurant remain open on weekends. We upheld the trial court's refusal to admit evidence proffered by the tenant showing that the landlord had breached its obligations to maintain and repair the premises. Noting that *Javins* defenses arose out of those conditions unique to residential urban housing, we held that "unless a contrary intention is expressed, the covenants in a lease are independent," and "where covenants are independent, non-performance by one party does not excuse the other party from the need to satisfy his obligations." *Id.*, 309 A.2d at 110. *See also Hinkel & Co. v. Manhattan Co.*, 165 U.S.App.D.C. 140, 145, 506 F.2d 201, 206 (1974) ("the District of Columbia Court of Appeals refused to apply the rationale of *Javins* to a commercial lease"); *Swesnik & Blum v. De Pandi*, 108 D.W.L.R. 2089, 2095

---

15. It should be noted that our reluctance to import *Edwards* into the commercial domain is one shared by other jurisdictions. *See William C. Cornitius, Inc. v. Wheeler*, 276 Or. 747, 556 P.2d 666 (1976) (en banc) ("The [*Edwards*] doctrine, which has not yet received universal recognition, was developed with special reference to a clear public policy of insuring tenants a safe and sanitary place to live ... [and] has been limited to situations in which the lease covered residential property, and the landlord's alleged violations had to do with conditions on the premises affecting safety and health."); *Rossow Oil Co., Inc. v. Heiman*, 72 Wis.2d 696, 242 N.W.2d 176 (1976); *Mobil Oil Corp. v. Rubenfeld*, 48 A.D.2d 428, 370 N.Y.S.2d 943 (1975); *Clark Oil & Refining Corp. v. Leistikow*, 69 Wis.2d 226, 230 N.W.2d 736 (1975); *Clark Oil & Refining Corp. v. Thomas*, 25 Ill.App.3d 428, 323 N.E.2d 479 (1974).

16. Significantly, in departing from the feudal model of property law, the *Javins* court rested its decision upon three premises. First, unlike their agrarian counterparts to whom the issue of the leased land remained paramount, the modern

tenant was seeking "a well known package of goods and services," *id.*, at 1074, including heat, light, ventilation, and proper sanitation and services. Second, a tenant's ability to effect repairs on often complicated modern plumbing electrical and heating systems is often limited and forces a reliance on the diligence and ability of the landlord. Third, and perhaps most central to the residential/commercial distinction, the residential lease often reflects the gross inequality of bargaining power between the landlord and tenant. *See also Schulman v. Vera*, 108 Cal.App.3d 552, 166 Cal.Rptr. 620, 625 (1980) where the court noted "the complexity of modern apartment buildings having complicated heating, electrical and plumbing systems hidden from view, the limited tenure of today's urban tenant which frequently will not justify extensive repair efforts, the unavailability to the average urban apartment dweller of financing for major repairs, and the unequal bargaining power of landlord and tenant resulting from the scarcity of adequate housing in urban areas."

(September 4, 1980) (where "the premises in question are commercial rather than residential, [ ] defenses premised upon a breach of warranty of habitability are not available"). We agree with the point made by the court in *Green v. Superior Court*, 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974) that "[a] lessor's breach of a covenant to repair contained in a commercial lease is a substantially different matter. The parties are more likely to have equal bargaining power, and, more importantly, a commercial tenant will presumably have sufficient interest in the demised premises to make needed repairs and the means to make the needed repairs himself or herself, if necessary and then sue the lessor for damages." *Contra, Reste Realty Corp. v. Cooper*, 53 N.J. 444, 251 A.2d 268 (1969).[17] Accordingly, without a warranty of habitability upon which to anchor a claim of retaliatory eviction, the defense is not available to commercial tenants.

It is undoubtedly true that commercial leases often include small commercial operators who do not possess equal bargaining power with their landlords. They sometimes may be no more knowledgeable about the quality of a structure than a residential tenant, and similarly may not be prepared to undertake the litigation expenses that an action for breach of contract may incur. But the legislature, which has acted comprehen-

sively in the area of residential tenants' rights, *see* D.C.Code § 45–2552, has not provided comparable remedies to commercial tenants. Nor has appellant pointed to anything that would otherwise indicate a public policy that suggests that the traditional view of the market place in which commercial tenancies are entered should be modified because, for example, of evidence of unconscionable mistreatment of commercial tenants by overreaching landlords. The court is ill equipped to weigh the competing considerations. Therefore, we conclude, without foreclosing the possibility that at some point the court may be presented with a case in which it would conclude that public policy, as amply set forth in the record on appeal, calls for extension of the retaliatory eviction defense to commercial tenants in mixed-use buildings, appellant has failed to present a record that would indicate that this is such a case.

*Affirmed.*

---

17. We acknowledge that our reluctance to extinguish the commercial/residential dichotomy, *see Ontell, supra* note 9, 527 A.2d at 1295 n. 5 ("[t]he legal distinction between commercial and residential tenancies is well grounded"), runs contrary to a recent spate of scholarly articles urging the courts to eradicate these historical distinctions. *See generally* Greenfield & Margolies, *An Implied Warranty of Fitness in Non–Residential Leases*, 45 ALB.L.REV. 855 (1981); Levinson & Silver, *Do Commercial Property Tenants Possess a Warranty of Habitability?* 14 REAL ESTATE L.J. 59 (1985); Comment, *Commercial Leases: Behind the Green Door*, 12 PAC.L.J. 1067 (1981); Comment, *Commercial v. Residential Leases: A New Double Standard?* 35 PITT.L.REV. 901 (1974); Comment, *Modernizing Commercial Lease Law: The Case for an Implied Warranty of Fitness*, 19 SUFF.L.REV. 929 (1985); *Cf.,* Bopp, *The Unwarranted Implication of a Warranty of Fitness in Commercial Leases—An Alternative Approach*, 41 VAND.L.REV. 1057 (1988). However, we conclude that the shortage of residential housing, and the poor bargaining positions of many low income housing tenants remain as clearly identifiable market forces affecting some residential tenants.