*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 18-CV-95 & 18-CV-271

CITY CENTER REAL ESTATE, LLC, APPELLANT,

V.

1606 7TH STREET NW, LLC, ET AL., APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAB-6624-16)

(Hon. Michael Rankin, Motions Judge)

(Argued May 16, 2019                    Decided December 2, 2021)

*Kenneth C. Crickman,* with whom *Robert C. Cooper* was on the brief, for appellant.

*Gwynne L. Booth*, with whom *Richard W. Luchs* was on the brief, for appellees 1606 7th St NW, LLC, and Donnie V. Hinton.

*Timothy G. Casey* for appellee Linda M. Low.

*Mark H.M. Sosnowsky*, with whom *Allen V. Farber* and *Jonathan H. Todt* were on the brief, for appellee Richard L. McCormack.

Before BECKWITH, *Associate Judge*, and RUIZ and FISHER, *Senior Judges*.[*]

---

[*] Judge Fisher was an Associate Judge at the time of submission. His status changed to Senior Judge on August 23, 2020.

BECKWITH, *Associate Judge*:  Sultan Gabre held a lease to 1606 7th Street NW, where he owned and operated a store on the ground floor.  After living on the second floor with his family for a few months, Mr. Gabre subleased one of the two rooms, keeping the other room for his personal use.  The central question of this case is whether Mr. Gabre continued to use that room as a residential tenant, which would entitle him to rights under the Tenant Opportunity to Purchase Act (TOPA)—a legislative scheme that gives eligible tenants a right of first refusal.[1]

Richard McCormack, the now-deceased owner of the property, entered an agreement to sell the property to Alex Associates, Inc. (AAI), a sole proprietorship owned by Devin Hinton.  In an effort to meet the TOPA requirements, and after consulting his real estate agent, appellee Linda Low, Mr. McCormack submitted an offer of sale to Mr. Gabre and his subtenants.  One subtenant assigned his TOPA rights to the appellant, City Center Real Estate, LLC (City Center), and Mr. Gabre assigned his purported TOPA rights to Alex Associates, Inc.  Mr. McCormack accepted the bid from Alex Associates, Inc., which assigned the purchase contract to appellee 1606 7th Street NW LLC (1606 LLC), a sole purpose entity co-owned

---

[1]  D.C. Code § 42-3404.01 (2020 Repl.).  "TOPA is a remedial statute, and it is to be generously construed 'toward the end of strengthening the legal rights of tenants or tenant organization to the maximum extent permitted under law.'" *Richman Towers Tenants' Ass'n, Inc. v. Richman Towers LLC*, 17 A.3d 590, 601 (D.C. 2011) (quoting D.C. Code § 42–3405.11 (2008)).

by Devin Hinton and his father, appellee Donnie Hinton.

City Center filed a complaint alleging that because Mr. Gabre was only a commercial tenant, he was not a tenant for TOPA purposes and thus had no TOPA rights to assign to 1606 LLC. The trial court granted summary judgment against City Center, ruling that Mr. Gabre used the upstairs floor for residential occupancy and that there was no genuine dispute of material fact that would require a jury to address the question. We reverse.

## I. Background

The record on appeal shows the following facts. Mr. McCormack leased the property, a two-story building, to Mr. Gabre in 2012. The written lease was not produced for the litigation of this case,[2] but it is undisputed that the lease gave Mr. Gabre the right to operate a grocery store on the ground level of the building. The parties agreed that the second story consisted of two rooms, and Mr. Gabre testified that one of the rooms was larger than the other. There was no dispute that for the first six months of his tenancy, Mr. Gabre and his family—his three children and their mother—resided in the larger room. Mr. Gabre and his family then moved and rented the larger room to Solomon Woldegebriel and Grmay Temesgen.

---

[2] Appellee 1606 LLC has represented that Mr. McCormack passed away before producing the lease, and that his Estate was unable to find it.

A couple of years later, Mr. McCormack entered into a contract to sell the property to Alex Associates, Inc. for $830,000.[3] Email correspondence between Mr. McCormack, Devin Hinton, and their real estate agents, "The Linda Low Team" from Long & Foster Real Estate, Inc. (L&F), show the following facts. L&F initially stated that the property was "subject to TOPA" with respect to Mr. Woldegebriel and Mr. Temesgen, but expressed doubt about whether Mr. Gabre lived in the building. Devin Hinton told L&F that Mr. Gabre "claims he is living there with his wife," but the L&F team responded that "according to the two other fellows upstairs he is not living there." L&F later told Devin Hinton that TOPA notice "ha[d] to be issued" to Mr. Gabre because he claimed he was living there. L&F therefore issued an Offer of Sale and Tenant's Opportunity to Purchase to Mr. Gabre, Mr. Woldegebriel, and Mr. Temesgen.

Sima Tessema, the sole owner of City Center, testified that he spoke with Mr. Woldegebriel about the sale of the building, after which Mr. Woldegebriel assigned his TOPA rights to Mr. Tessema. Mr. Tessema agreed to pay Mr. Woldegebriel in

---

[3] *Devin* Hinton, who is not a party to this appeal in his personal capacity, established and owns Alex Associates, Inc. Appellee *Donnie* Hinton is a partner at a general partnership called Alex Associates—which has no relation to Alex Associates, Inc. Donnie Hinton and Devin Hinton co-own 1606 LLC, to which Alex Associates, Inc. assigned its purchase contract. Donnie Hinton swore in an affidavit that neither he nor Alex Associates was involved with the purchase of the property "with the exception of providing funds to 1606 LLC to make said purchase."

exchange for the assignment, contingent on closing. Mr. Woldegebriel notified L&F that he had assigned his right to purchase to City Center. City Center then notified L&F and Mr. McCormack of its status as a TOPA assignee and its interest in exercising its right to purchase the property. City Center provided a purchase contract for $830,000 to match the third party contract. Meanwhile, Mr. Gabre asked the D.C. Department of Housing and Community Development (DHCD) whether he had any rights under TOPA. Mr. Gabre stated in an email that he had a business on the first floor and a "residence" on the second floor and that the realtors had "threaten[ed]" him. DHCD informed Mr. Gabre that he was entitled to TOPA rights if he lived in the residential part of the building. Mr. Gabre forwarded this email exchange to Mr. McCormack, who shared it with the L&F team. L&F forwarded the exchange to Devin Hinton.

Mr. Gabre testified that Devin Hinton came into the store and discussed the sale of the building with Mr. Gabre, who told Mr. Hinton that he lived in the smaller room and that two other renters lived in the larger room. Soon thereafter, Mr. Gabre assigned his TOPA rights to Alex Associates, Inc. in exchange for $30,000. Alex Associates, Inc. notified Mr. McCormack that it wished to exercise its TOPA rights as Mr. Gabre's assignee. Alex Associates, Inc. negotiated the purchase price to $850,000. Mr. McCormack selected Alex Associates, Inc.'s bid and the parties ratified a contract for a purchase price of $850,000. Alex Associates, Inc. later

assigned the contract to 1606 LLC—the current owner of the property.

City Center filed a complaint against 1606 LLC, Alex Associates, Inc.,[4] Donnie Hinton, Mr. McCormack, Ms. Low, and Mr. Gabre, alleging common law fraud, civil conspiracy, intentional interference with contractual relations, violations of the District's Consumer Protection Procedures Act, intentional interference with business relations, and violations of TOPA. The crux of City Center's complaint was that the parties worked together to falsely represent Mr. Gabre's tenancy as residential, rather than commercial, so that Alex Associates, Inc. would win the contract over Mr. Tessema.

The defendants filed motions for summary judgment, arguing that City Center could not prevail on any of its claims because every claim rested on the theory that Mr. Gabre was not a residential tenant entitled to TOPA rights.[5] The trial court granted the motions for summary judgment, ruling that there was no dispute that the

---

[4] The court dismissed City Center's claim against Alex Associates, Inc. because it was not a proper party in the matter.

[5] The appellees also argued that City Center could not prevail on any of its claims at trial because it had adduced no evidence of damages. In addition, 1606 LLC and Donnie Hinton argued that Donnie Hinton was not a proper party to the case. The trial court's ruling on the motion for summary judgment did not explicitly address either argument.

"second floor of the property was used exclusively as residential property," that the tenant before Mr. Gabre had used the upstairs "solely for residential purposes," or that Mr. Gabre had "separated the upstairs after moving his family to Virginia so that he could sublet a room to his 'friends' while maintaining a residence for his own use or occupancy." This appeal followed.[6]

## II. Analysis

City Center argues that there was a genuine dispute over Mr. Gabre's purported status as a residential tenant, which bears on the question whether Mr. Gabre had TOPA rights that could be assigned to Alex Associates, Inc. Answering that question requires first determining what it means to be a tenant under TOPA.

## A.

The question whether summary judgment was properly granted is a question of law, which we review de novo. *Allman v. Snyder*, 888 A.2d 1161, 1165 (D.C. 2005). Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-moving party, the court determines there is no genuine dispute

---

[6] City Center does not appeal the Superior Court's dismissal of City Center's claims for common law fraud and civil conspiracy, intentional interference with contractual relations, and interference with business relations with respect to Mr. McCormack and Ms. Low. City Center appealed those claims only with regard to 1606 LLC and Donnie Hinton.

of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Cormier v. District of Columbia Water & Sewer Auth.*, 959 A.2d 658, 663 (D.C. 2008). "If a moving defendant has made an initial showing that the record presents no genuine issue of material fact, then the burden shifts to the plaintiff to show that such an issue exists." *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C. 1991) (citation omitted). The non-moving party cannot meet that burden and avoid summary judgment "'merely by impugning [the] honesty' of the moving party's witness". *See Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) (citing *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999)) (alterations in original).

TOPA extends a panoply of rights to residential tenants whose landlord proposes to sell the property or discontinue its use as rental housing. *See 1836 S St. Tenants Ass'n, Inc. v. Estate of B. Battle*, 965 A.2d 832, 838 (D.C. 2009). Such rights include the right of first refusal on any sale contract the landlord negotiates with a third party and the right to assign one's TOPA rights to a third party. *See* D.C. Code § 42-3404.08 (2020 Repl.); *Allman*, 888 A.2d at 1167. These rights align with one of the District of Columbia Council's stated purposes of enacting TOPA: "To discourage the displacement of tenants through conversion or sale of rental property, and to strengthen the bargaining position of tenants toward that end . . . ." *Id.* § 42-3401.02(1). The Council aimed to empower "tenants who are most directly

affected by the conversion" of rental housing units into condominiums or cooperatives, and to "more effectively assure that housing will be preserved at a cost which can be afforded by current tenants who would otherwise be involuntarily displaced." *Id.* § 42-3401.01(7).

The issue in this case is if Mr. Gabre was a "tenant" entitled to TOPA rights. Under the definitions that apply to TOPA, a "tenant" is any person "entitled to the possession, occupancy or benefits of a rental unit within a housing accommodation." *Id.* § 42-3401.03(17). A "housing accommodation" is "a structure . . . containing 1 or more rental units and the appurtenant land." *Id.* § 42-3401.03(11). A "rental unit" is "that part of a housing accommodation which is rented or offered for rent for residential occupancy and can be an apartment, efficiency apartment, room, suite of rooms, and single-family home or duplex, and the appurtenant land to such rental unit." *Id.* § 42-3401.03(16).

Two key concepts lack statutory definitions: "residential occupancy" for purposes of defining the "rental unit," and "entitle[ment] to possession, occupancy, or benefits" of the rental unit. Though it is clear that commercial tenants are not protected by TOPA, *see Pelkey v. Endowment for Cmty. Leadership*, 841 A.2d 757, 760 (D.C. 2004); 14 DCMR § 4711.7 (2020) ("Commercial tenants shall not be

entitled to the first right to purchase."), very few TOPA cases discuss these terms.[7]

When interpreting a statute, this court may take guidance from other statutes with similar language. *See Jeffrey v. United States*, 892 A.2d 1122, 1129 (D.C. 2006) (taking guidance from the "almost identical" drug-free zone statute to interpret the District's gun-free zone statute). The definitions of "tenant," "housing accommodation," and "rental unit" that apply to TOPA are identical to the definitions in the Rental Housing Act of 1980 (RHA). *See* D.C. Code §§ 42-3501.03(14), (33), (36). Cases interpreting the RHA have looked to the case law of the Rent Control Act of 1941 (RCA) as persuasive. *See, e.g.*, *Revithes v. District of Columbia Rental Hous. Comm'n*, 536 A.2d 1007, 1015 (D.C. 1987) (citing *White v. Allan*, 70 A.2d 252 (D.C. 1949)). The RCA and TOPA use similar language when addressing residential tenancy. *Compare* D.C. Code § 45-1611(f) (1941) (defining "tenant" as any person "entitled to the use or occupancy of any housing accommodation"), *and id.* § 45-1611(a) (defining "housing accommodations" as any "building, structure, or part thereof . . . rented or offered for rent for living or dwelling purposes"), *with* D.C. Code § 42-3401.03(17), *and id.* §§ 42-3401.01(11),

---

[7] In *Pelkey*, the only case analyzing whether a person was a commercial or residential tenant for TOPA purposes, this court took as a given that the plaintiff's use of "an office for his consulting business" was not residential occupancy under TOPA. *See* 841 A.2d at 760. Additionally, as discussed further below, one case analyzing what it means to be "entitled to the possession, occupancy, or benefits" of a rental unit under TOPA determined that the possession must be "lawful." *See Redman v. Potomac Place Assocs.*, 972 A.2d 316, 320–21 (D.C. 2009).

(16) (defining "housing accommodations" in relation to "rental units," which are defined as units "rented or offered for rent for residential occupancy.").

To determine whether a particular unit is rented for "residential occupancy" in both the RHA and RCA contexts, this court has employed a factual, totality-of-the-circumstances analysis. *See Revithes*, 536 A.2d at 1013; *Ontell v. Capitol Hill E.W. Ltd. P'ship*, 527 A.2d 1292, 1294 n.2 (D.C. 1987); *Bellmore v. Baum*, 68 A.2d 588, 591 (D.C. 1949) ("Whether property is commercial and therefore free from [rent] control [under the RCA], or whether it is partly residential is ordinarily a question of fact."). Of primary importance is the tenant's "actual use and occupancy" of the space as a residence. *See Revithes*, 536 A.2d at 1015; *cf. District of Columbia v. Beatley*, 665 A.2d 204, 206 (D.C. 1995) (concluding that it was permissible for assessor to determine a property was commercial based on the fact that the property "was zoned for commercial use and was actually being used for commercial purposes"). In one RHA case where a landlord attempted to argue that she had commercial leases with two of her six tenants, the court emphasized that those tenants labeled the space an "apartment" that they "occupied" and that the tenants had items such as "household goods" in the space. *Revithes*, 536 A.2d at 1015. Similarly, in an RCA case, the court emphasized that the tenant's "actual use" of a building as a rooming house controlled, even where her lease was commercial on its face. *White*, 70 A.2d at 254. Conversely, we determined that a tenant's use

of his space to "conduct[] a law practice from the premises" excluded him from the protections of the RHA. *Ontell*, 527 A.2d at 1294 n.2; *see also Espenschied v. Mallick*, 633 A.2d 388, 389 (D.C. 1993) (noting that a tenant was not protected under the RHA because she had a commercial lease to "operat[e] a bookstore in a mixed-use building"); *Pelkey*, 841 A.2d at 760 ("Given his business reason for occupying the unit, [Mr. Pelkey's] arguments on appeal relating to the protections of [TOPA] . . . are unavailing.").

The residential characteristics of the physical unit are also significant. In *Revithes*, the court emphasized that the units had residential areas such as a "living room," "bedroom," and "bathroom," and that the units contained furnishings such as a "mantel," a "fireplace," "shelving," "refinished floors," and a "living room chandelier." 536 A.2d at 1015. In the context of the RCA, this court noted that "such elements as single or multiple toilet facilities, entrances, kitchens, heating systems, and gas, water and electric meters" would inform the determination whether a property qualifies as a residential unit. *Bellmore*, 68 A.2d at 591.

This court has stated that the term "tenant" in the RHA "inescapably means the leaseholder" and does not extend to a person who simply "occupies" a space in a residential way. *Tenants of 1460 Euclid St., N.W. v. District of Columbia Rental Hous. Comm'n*, 502 A.2d 470, 472 (D.C. 1985). For that reason, we have concluded

in the TOPA context that one who is not a "lawful tenant" does not enjoy TOPA rights. *Redman*, 972 A.2d at 321; *cf. Crockett v. Deutsche Bank Nat'l Tr.*, 16 A.3d 949, 951 (D.C. 2011) (concluding that a landlord-tenant relationship does not arise by "mere occupancy" and that a squatter is not entitled to protections under a Superior Court rule applicable to leaseholders). Something more than mere occupancy is required, but there is no requirement that a person have a formalized "contractual relationship" with a landlord in order to be a tenant. *Adm'r of Veterans Affairs v. Valentine*, 490 A.2d 1165, 1168–69 (D.C. 1985). This court has regularly employed a fact-based inquiry to determine the lawfulness of someone's occupancy. *See, e.g.*, *Young v. District of Columbia*, 752 A.2d 138, 143 (D.C. 2000) (using a factual analysis based on "the payment of rent and other conditions of occupancy between the parties" to determine if a person was a subtenant entitled to RHA eviction protections).

The landlord's actual knowledge of and acquiescence to a tenant's use of space for residential occupancy is the key factual question in the analysis. In *Revithes*, the court stated that where the landlord has "actual knowledge" of the residential use of the space, such as if a tenant informs the landlord that she is using the space for living purposes, formal labels such as a commercial lease do not control. *See* 536 A.2d at 1015; *see also White*, 70 A.2d at 254 ("[T]he tenant, with the knowledge of the landlord, proceeded to use the premises as a rooming house.").

We concluded similarly in *White*, where the parties' lease contained a covenant that the lease be used for commercial purposes, but the landlord "consented" to the residential use. 70 A.2d at 254; *see also Richman Towers Tenants' Ass'n v. Richman Towers LLC*, 17 A.3d 590, 601 (D.C. 2011) ("[T]he courts will not permit themselves to be blinded . . . by mere forms . . . but, regardless of fictions, will [deal with] the substance of the transaction . . . as the justice of the case may require.") (quoting *Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490, 501 (1918)) (omissions in original).

When determining whether a person is a "tenant" entitled to possess, occupy, or benefit from a "rental unit," courts should take into account whom the statute is "designed to protect." *Valentine*, 490 A.2d at 1168 (RHA context); *see also Richman Towers*, 17 A.3d at 602 (TOPA context). TOPA and the RHA were both enacted as part of a "comprehensive legislative scheme to protect the rights of tenants," and thus we have stated that both statutes should be "construed liberally" to effectuate their purpose. *Valentine*, 490 A.2d at 1168; *see also Richman Towers*, 17 A.3d at 602 (stating in TOPA context that "[c]ourts deal with the substance rather than the form of transactions and will not permit important legislative policies to be defeated by the artifices affecting legal title but not the practical consequences of the existing situation") (internal citations omitted); D.C. Code § 42-3405.11 ("The purposes of this chapter favor resolution of ambiguity . . . toward the end of

strengthening the legal rights of tenants or tenant organizations to the maximum extent permissible under law."). In *Valentine*, a woman rented an apartment from a mortgagor whose property was foreclosed by the bank and sold to the Veterans Administration (VA). 490 A.2d at 1166. This court had previously concluded that statutory eviction restrictions in the RHA did not protect a defaulting mortgagor. *Simpson v. Jack Spicer Real Estate, Inc.*, 396 A.2d 212 (D.C. 1978). Based on that holding, the VA argued that the woman renting an apartment from the defaulted mortgagor likewise had no rights as a tenant under the RHA. *Valentine*, 490 A.2d at 1168. The court rejected the VA's argument, concluding that the VA's proposed definition of "tenant" was too "rigid[]" and failed to take into account whom the RHA was "designed to protect." *Id.* In this way, when conducting statutory interpretation of the definition of "tenant" in the RHA and TOPA, courts need not be wedded to "the technical precepts of real property law." *See id.* at 1170.

In sum, under TOPA, whether one is a "tenant"—a person "entitled to the possession, occupancy, or benefits of a rental unit" that is rented for "residential occupancy," D.C. Code § 42-3401.03(17)—is a highly fact-based inquiry, requiring courts to take into account the person's actual use of the space, the characteristics of the space itself, and the landlord's acknowledgement of the residential use. The formal labels in a lease, while relevant, do not supersede a factual determination of the actual relationship between the landlord and the tenant. And again, when

interpreting TOPA, we are guided by TOPA's purposes of protecting and "strengthening" the rights of tenants. D.C. Code § 42–3405.11

**B.**

With these principles in mind, we turn to City Center's argument that the trial court wrongly granted summary judgment despite a genuine dispute over whether Mr. Gabre was a TOPA tenant—that is, truly a residential tenant.

**1.**

We first examine the evidence regarding Mr. Gabre's actual use of the smaller upstairs unit and the property as a whole. The trial court ruled that there was no genuine dispute of fact that Mr. Gabre used the unit "exclusively as residential property . . . for residential purposes." Appellees argue that Mr. Gabre's deposition testimony demonstrated that he "actual[ly] use[d]" the smaller room as a residence. *See Revithes*, 536 A.2d at 1015. Mr. Gabre stated, for example, that he slept there "three or four days" per week and that he had a mattress, sheet, rug, blanket, and hanging clothes in the room. Appellees also point out that Mr. Gabre's testimony is supported by interrogatory answers given by 1606 LLC, which stated that when Devin Hinton toured the property, Mr. Gabre and his family were present and "appeared to be living there."

The record includes plenty of evidence that conflicts with appellees'

contention that Mr. Gabre actually used the property for residential occupancy. First, Mr. Gabre's testimony that he resided upstairs was not undisputed; Mr. Tessema contradicted Mr. Gabre's claim. Mr. Tessema stated that at some point shortly after learning of the Offer of Sale, Mr. Tessema spoke with Mr. Gabre about the possibility of selling his TOPA rights and Mr. Gabre responded that he was not a residential tenant.[8] This presents a factual dispute that should not have been resolved by summary judgment.

City Center also contends that Mr. Gabre admitted to residing in Virginia in the Foxchase Apartments, having a Virginia driver's license and car registration, and sending his children to school in Virginia. The trial court understood City Center to be arguing that a person cannot have more than one residence and rejected that argument, stating that "Plaintiff appears to confuse the concept of domicile, of which a person has only one, and the concept of residence, where persons can have multiple residences." But City Center does not argue that a TOPA tenant cannot receive

_____

[8] Mr. Tessema also stated that Mr. Woldegebriel reported to him that Mr. Gabre "apparently brought his [family] in from his home in Virginia, placed them in his (Solomon's) apartment unit, laid out a bunch of kid's [sic] toys on the floor, and then paraded the real estate agents through their [sic], pretending that Solomon's apartment was actually Sultan's." 1606 LLC characterizes this statement as "nothing more than hearsay." The parties have not fully briefed this question, and the statement itself is not necessary to our determination that there remains a factual dispute regarding whether Mr. Gabre was a residential tenant. If the question arises again on remand, the trial court should resolve it in the first instance.

protections in regards to his second residence. City Center argues that a jury could have taken into account Mr. Gabre's admissions that the smaller room was not his primary residence as the jury evaluated Mr. Gabre's actual use of the property, and could have determined that Mr. Gabre was not in fact actually using the smaller room as a residence.

**2.**

We turn next to the arguments regarding the characteristics of the unit. The record shows a genuine dispute over whether the smaller room had any of the traditional characteristics of a residential space.[9] First, there is conflicting testimony on the structure of the second floor. In an answer to an interrogatory, appellee Donnie Hinton stated that the upper floor consisted of two rooms that were not connected to each other, and that the larger room was connected to a living room and contained a bathroom. Mr. Gabre also indicated in his deposition that the smaller room was not connected to a kitchen or a bathroom. Mr. Tessema testified, to the contrary, that the second floor consisted of a single unit with two bedrooms, a kitchen, and a living room, all accessible through a single door. The record does not contain any floor plans that would help to resolve the dispute.

---

[9] The parties do not dispute that the larger room was a residential unit.

A small room unconnected to a bathroom or kitchen is not necessarily "exclusively residential property" as the trial court concluded. In the RHA and RCA contexts, this court has regarded bathrooms as relevant to its appraisal of a particular unit. *See Revithes*, 536 A.2d at 1015 (noting that the unit had residential features such as a bathroom); *Bellmore*, 68 A.2d at 591 (noting the relevance of "such elements as single or multiple toilet facilities"). The District's housing code is a fitting guide for the court's analysis, for TOPA purposes, of the qualities of a residential unit, as the housing code provides that "[n]o owner, licensee, or tenant shall occupy or permit the occupancy of any habitation in violation of this subtitle." 14 DCMR § 400.1. If the second floor was a residence, then the owner of the building would be required to adhere to these regulations. The housing code requires that bathrooms "shall be accessible to the occupants of rooming units without the necessity of occupants going through . . . [a]nother rooming unit . . . [a] sleeping room which is part of another habitation; or . . . a commercial or industrial establishment." 14 DCMR § 401.3(a)–(d). Mr. Gabre's and Donnie Hinton's testimony would therefore support a finding that the second-floor room Mr. Gabre used was *not* a residential unit. Mr. Gabre himself testified at one point during his deposition that he and his family had to go "downstairs" to use the bathroom, meaning they had to pass through "a commercial or industrial establishment." Even if Mr. Gabre used the bathroom in the larger unit, as he occasionally used the kitchen,

he still would not have been able to access it without "going through . . . [a]nother rooming unit." 14 DCMR § 401.3(a). These facts demonstrate a genuine dispute about this factor in residential occupancy analysis, which is material to a TOPA analysis.

**3.**

Finally, the evidence that Mr. McCormack knew of and acquiesced to Mr. Gabre's residential use of the smaller room is conflicting. On the one hand, the appellees argue that Mr. McCormack's decision to send Mr. Gabre TOPA notice that labeled the property as a "Single Family House" proves that Mr. McCormack acknowledged Mr. Gabre as a residential tenant. But the record also shows that Mr. McCormack's team struggled for days to determine whether TOPA required Mr. McCormack to notify Mr. Gabre—and in fact, L&F told the title company that it needed to contact DHCD to determine whether L&F needed to issue TOPA notice to "all three" occupants. That L&F issued TOPA notice to all three men, though plainly relevant, does not necessarily amount to an admission that L&F deemed Mr. Gabre to be a TOPA tenant. This ambiguity constituted genuine dispute over a material fact: whether Mr. Gabre was a TOPA tenant.

Viewing the record in the light most favorable to City Center, *Cormier*, 959 A.2d at 663, we conclude that a reasonable jury, considering all of the evidence

related to residential occupancy, could have found that Mr. Gabre did not use the property as a residence, that the smaller unit on the second floor did not possess the characteristics of a residential unit, or that the landlord did not acquiesce to Mr. Gabre's residential use of the unit. These amount to genuine disputes of fact of whether Mr. Gabre was a residential tenant, which are conducive to resolution by a jury.[10] For these reasons, we conclude that the trial court's finding that there was no genuine dispute as to Mr. Gabre's residential tenancy was erroneous and remand for further proceedings consistent with this opinion.[11]

---

[10] City Center suggested that, as a matter of law, Mr. Gabre could not be a residential tenant and a commercial tenant at the same time. Because we remand on City Center's factual claim, we do not address this argument. Nevertheless, it bears mention that the cases cited by City Center stand only for the proposition that a single unit cannot be both commercial and residential at the same time. *See Ontell*, 527 A.2d at 1294 n.2; *Espenschied*, 633 A.2d at 389. Neither case supports City Center's argument that a person cannot have one commercial unit and one residential unit in a mixed-use building.

[11] Accordingly, we vacate the award of costs to 1606 LLC that were based on the attorney fee provision of TOPA. D.C. Code § 42-3405.03. Appellees argue that City Center produced no evidence of monetary damages, which should be "fatal" to City Center's opposition to summary judgment. *See, e.g.*, *Basiliko v. Pargo Corp.*, 532 A.2d 1346, 1348 (D.C. 1987). But City Center's complaint requested both monetary compensation and equitable relief, including a request to enjoin the appellees from interfering with City Center's TOPA rights and to declare that the transfer of title between Mr. McCormack and 1606 LLC was null and void. As we discuss below, Mr. Woldegebriel could transfer *his* TOPA rights to City Center regardless of Mr. Gabre's status. Thus, City Center could be entitled to specific performance. "Specific performance is an extraordinary equitable remedy, and the determination whether or not to order specific performance is confided to the 'sound

## C.

Appellees argue that if Mr. Gabre's occupancy was not residential, then neither Mr. Woldegebriel nor Mr. Temesgen—Mr. Gabre's subtenants—can be residential tenants, because Mr. Gabre could not give what he does not have. Assuming this premise is correct, they argue that the initial contract for sale between Mr. McCormack and Alex Associates, Inc.—before the TOPA notices were issued—would become binding, and appellees would prevail.

Mr. McCormack and Ms. Low argue this for the first time on appeal. Normally, we would not consider an issue raised for the first time on appeal. *See, e.g.*, *Easter Seal Soc'y for Disabled Child. v. Berry*, 627 A.2d 482, 488 (D.C. 1993). Nevertheless, this principle is "one of discretion rather than jurisdiction." *District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 33 n.3 (D.C. 2001). We have noted that we may consider an issue raised for the first time on appeal in "[e]xceptional cases where injustice might otherwise result." *Easter Seal*, 627 A.2d at 488. We have also stated that we may consider a new issue that is "purely one of law, particularly if the factual record is complete [on that question] and a remand for

---

and informed discretion' of the trial court." *Indep. Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 867–68 (D.C. 2005) (quoting *Drazin v. Am. Oil Co.*, 395 A.2d 32, 34 (D.C. 1978)). We find it is "premature to reach and resolve the issues" of damages given our remand on the TOPA tenant issue. *Saunders v. Hudgens*, 184 A.3d 345, 351 n.19 (D.C. 2018).

further factual development would serve no purpose." *Dwight Reid*, 766 A.2d at 33 n.3; *see also Beard v. United States*, 535 A.2d 1373, 1377 (D.C. 1988) ("Because several of the other issues raised by appellant will inevitably arise at the new trial, we address them now."). Because the purely legal argument urged by the appellees will inevitably arise during trial and the factual record on Mr. Woldegebriel's and Mr. Temesgen's subtenancies is sufficient to resolve this question, it is in the interest of judicial efficiency to address the legal merits now.

Neither appellee raising this claim cites case law in support of their argument. Rather, their contention appears to rest on a foundational tenet of property and contract law, "*Nemo plus juris ad alium transferre potest quam ipse habet*," meaning "No one can transfer more right to another than he has himself." *See, e.g.*, *Nemo plus juris ad alium transferre potest quam ipse habet*, Black's Law Dictionary (5th Ed. 1979); *see also Ventress v. Smith*, 35 U.S. 161, 175 (1836). We have stated that a contract assignee possesses the same rights and remedies as those possessed by the assignor, but no greater. *LeRoy Adventures, Inc. v. Cafritz Harbour Grp., Inc.*, 640 A.2d 193, 199 (D.C. 1994), *modified on reh'g*, 660 A.2d 908 (D.C. 1995) (citing *Fox-Greenwald Sheet Metal Co. v. Markowitz Bros.*, 452 F.2d 1346, 1357 n.69 (D.C. Cir. 1971)). The crux of the appellees' argument, appearing to draw from those principles, is that "if [Mr.] Gabre could only be a commercial tenant under City Center's analysis, all [Mr.] Gabre could offer as a sublandlord to [Mr.] Woldegebriel

was a commercial tenancy, and, *ergo*, no TOPA rights could be assigned to City Center from [Mr.] Woldegebriel."

TOPA rights are not derived from property or contract law, however. They are instead statutory rights provided by the D.C. Council to protect renters and prevent the conversion of rental housing into other uses. *Richman Towers*, 17 A.3d at 601. The plain language of "tenant" under TOPA includes both "tenant[s]" and "subtenant[s]," indicating that a subtenant derives her statutory TOPA protections independently from her sublease. *See* D.C. Code § 42-3401.03(17).

This court in fact addressed and rejected a similar argument in the RHA context. *Valentine*, 490 A.2d at 1168. In *Valentine*, the VA had purchased a property after a defaulting mortgagor foreclosed on it, and argued that the existing tenant of the defaulting mortgagor would not be protected by the RHA because the RHA exempts defaulting mortgagors from its protections. 490 A.2d at 1168. Because the tenant's rights flowed from the defaulting mortgagor, the VA argued, the tenant would be similarly unentitled to RHA protections. *Id.* In rejecting the VA's argument, the court stated the VA had "succumbed to the . . . fallacy" of asking the court to apply an inflexible approach based "solely according to the technical precepts of real property law." *Id.* at 1168, 1170. The RHA, which is a "remedial" statute that should be "construed liberally," is part of a comprehensive

legislative scheme meant to protect the rights of people who rent. *Id.* at 1168. This court determined that the RHA, "in the context of the District's rent control statutes," would protect the tenant even though her occupancy rights were based solely on a lease with the defaulting mortgagor whose own rights to the property were extinguished by foreclosure. *Id.* at 1169.

Mr. Woldegebriel and Mr. Temesgen, whose entitlement to possess the larger room for residential purposes was not disputed, were entitled to TOPA protections at the time of sale even if Mr. Gabre was not.[12]  As we stated at the outset, one of the Council's purposes in enacting TOPA was "[t]o discourage the displacement of tenants through conversion or sale of rental property, and to strengthen the bargaining position of tenants toward that end."  D.C. Code § 42-3401.02(1).  Mr. Woldegebriel and Mr. Temesgen's entitlement to the possession and occupancy of the larger unit for residential purposes was not disputed in the Superior Court.  Both men were actually using it for residential purposes.  Their unit included a bathroom and a kitchen, and their rooms contained beds.  *Valentine* indicates that even if Mr. Gabre was not a residential tenant for purposes of TOPA, his subtenants could be.

---

[12] This court would confront a different question if it were unclear whether Mr. Woldegebriel and Mr. Temesgen's subtenancy was lawful.  TOPA protects residential tenants whose tenancy itself is lawful.  We can imagine, but do not in this case confront, facts where an improper subtenancy agreement could throw the TOPA status of the subtenants into doubt.  Here, however, it is undisputed that Mr. Woldegebriel and Mr. Temesgen were lawful residential subtenants.

490 A.2d at 1168–70. Because it is undisputed that they actually resided in the space, they were at risk of displacement from the initial sale. We therefore disagree with the appellees' argument and conclude that City Center's purchase of Mr. Woldegebriel's TOPA rights would give City Center a viable claim to the property even if a jury found Mr. Gabre was not a residential tenant.

## III.

Given the genuine factual dispute over whether Mr. Gabre's use of the upstairs unit entitled him to TOPA rights, we reverse the trial court's grant of summary judgment to the appellees and remand for further proceedings.

*So ordered.*